# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:

ARK LABORATORY, L.L.C.,

    Debtor.

_____/

Case No. 23-43403
Chapter 11
Hon. Maria L. Oxholm

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO THE ORDER AUTHORIZING INTERIM USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION

The Official Committee of Unsecured Creditors, by its proposed counsel, Taft Stettinius & Hollister LLP (the "Committee"), objects to the entry of the Order Authorizing Interim Use of Cash Collateral and Granting Adequate Protection [ECF No. 43] (the "Interim Cash Collateral Order") as a final order, for the following reasons:

## Summary of Objection

1. Comerica Bank (the "Bank"), the primary secured creditor of Ark Laboratory, L.L.C. (the "Debtor"), is believed to have an equity cushion in this bankruptcy case based on the information reported by the Debtor in its Schedules ECF Nos. 52-61] filed in this case. Nevertheless, the Bank has demanded that certain terms and conditions be included in the Interim Cash Collateral Order which significantly impair the ability of the Debtor and the Committee to maximize the value of the Debtor's assets for the benefit of all parties.

1

2. For example, the Bank, that is adequately protected under the Interim Cash Collateral Order in a variety of ways, seeks to strip a substantial sum of cash out of the Debtor's estate without ensuring that all administrative claims are paid during the chapter 11 case. Moreover, the Bank further seeks to limit the role of the Committee in this case by (i) refusing to provide a carve out or even a reasonable line item for professional fees incurred, and (ii) failing to provide a reasonable period of time for the Committee to (a) review and, if appropriate, object to the validity, priority and perfection of the Bank's claims and liens, and (b) investigate and pursue any potential causes of action against the Bank.

3. Furthermore, the Bank only agrees to provide notice of default if the Debtor or the Committee are not aware of a potential default under the Interim Cash Collateral Order, thereby placing the Committee in a "gotcha" position and having to potentially litigate what the Committee knew and when, rather than requiring the Bank to provide notice of default in all cases before seeking to terminate the use of cash collateral.

4. The Interim Cash Collateral Order also provides for permanent paydowns of principal to the Bank from unexpected recoveries of assets, excluding proceeds of accounts receivable, without first determining the validity, priority and amount of the Bank's secured claim. Thes permanent paydowns also hamper the ability of the Debtor to operate during this chapter 11. Furthermore, any paydown of

debt during the bankruptcy constitutes an improper payment of the prepetition claim of the Bank. Any paydown of the Bank's principal should not be authorized outside the parameters of a confirmed chapter 11 plan.

6. Finally, the Interim Cash Collateral Order contemplates that Debtor's authority to use cash collateral could promptly terminate in this case while failing to provide funding for outstanding administrative expenses of the Debtor, thereby potentially leaving an administratively insolvent estate. In addition, the Interim Order disincentives unsecured creditors from continuing to do business with the Debtor during the bankruptcy because they risk disgorgement of amounts paid to them that are permitted in the budget if the Debtor is in default of the Interim Cash Collateral Order even though such creditors may not have knowledge of the alleged default.

7. Accordingly, the Committee cannot support the Interim Cash Collateral Order becoming a final order in this case unless the ability of the Debtor to operate is more equitably balanced with the desire of the Bank to get its claim paid. The Committee understands the desire of the Bank to move this case to a quick conclusion. However, given the Bank's equity cushion, many of the provisions of the Interim Cash Collateral Order are inappropriate and do nothing other than to limit the Debtor's ability to operate, while failing to allow the Debtor the opportunity to restructure its balance sheet and reorganize or, alternatively, sell the business as a

going concern in order to maximize the value of the assets for all parties in interest. Accordingly, the Committee objects.

## Background

### I. The Bankruptcy Filing and the Appointment of the Committee.

8. On April 12, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtor is a laboratory that provides medical diagnostic testing, such as toxicology, hematology, chemistry, immunochemistry, urinalysis, coagulation, PCR, PGX and other testing services and is CLIA certified, CAP proficient, and COLA accredited. The Debtor continues to operate and to manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9. The Committee was appointed by the Office of the United States Trustee on May 1, 2023 [ECF Nos. 68 and 70].

10. On May 4, 2023, the Committee met and decided that it would employ Taft Stettinius & Hollister LLP as its counsel to advise and represent it in this proceeding.

### II. The Indebtedness.

11. Prior to the Petition Date, the Debtor entered into a master revolving note, a security agreement and a forbearance agreement with the Bank and a personal

guaranty (the "Guaranty") with Jim Grossi ("Grossi"), a principal and the managing member of the Debtor (collectively, the "Prepetition Loan Documents"). According to the Bank, the outstanding indebtedness owed to the Bank as of the Petition Date was $6,536,566.07, comprised of principal in the amount of $6,376,908.51, interest of $23,360.32, plus costs, fees and expenses that continue to accrue (the "Indebtedness").

8. The Debtor agreed in the Interim Cash Collateral Order that it had granted the Bank a security interest and lien on substantially all of their property and assets including, among other property, its cash and its accounts receivables (collectively, the "Collateral").

9. The Debtor contends that the total value of its assets is $11,096,191.30, comprised of real property in the amount of $479,656.87 and personal property in the amount of $10,919,534.43. Accordingly, the Bank has an equity cushion in this case.

10. There are two other creditors – The Peninsula Fund VII Limited Partnership ("Peninsula") and Diesel Funding, LLC ("Diesel") – each of which asserts a secured claim and an interest in cash collateral. Peninsula contends that it is owed $14,940,749.14, which amount is secured by a junior lien in substantially all the Debtor's assets pursuant to a Senior Subordination Agreement dated January 19, 2021. Diesel contends that it is owed $258,577.50 pursuant to a Merchant Cash

5

Advance Agreement dated March 10, 2023, under which Diesel advanced funds to the Debtor that it characterizes as a purchase of certain future accounts receivable of the Debtor.

### III. The Interim Cash Collateral Order.

10. On April 24, 2023, the Court entered the Interim Cash Collateral Order which, among other things, (i) authorized the Debtor use cash collateral in the amount of $1,556,049.00, as reflected in budget filed on April 21, 2023 as an Exhibit to Docket No. 41, as further amended on April 25, 2023 at Docket No. 48 ("<u>Budget</u>") during the Interim Period (as defined in the Interim Cash Collateral Order), Interim Cash Collateral Order, ¶¶ 1(b) and (c), pgs. 5 and 6, and 14; (ii) granted the Bank, Peninsula and Diesel continuing and replacement security interests and liens to the same extent, validity and priority as existed on the Petition Date as adequate protection, *Id.* at ¶ 2, pgs.9-10; (iii) established the Budget limiting the use of cash collateral with a line item variance, along with requiring weekly reporting to the Bank, Peninsula and the Committee and a reconciliation of post-petition performance to the Budget, *Id.* at ¶¶1(e) and (i), pgs. 6-8; (iv) authorized a monthly payment of interest (at the non-default rate) in the amount of $43,856.00 to the Bank, *Id.* at ¶¶ 1(d), pg. 6,, and 1, pg. 9, and the Budget; (v) requiring that all cash proceeds of any unusual or extraordinary amount (exclusive of payment of accounts receivable) be applied as permanent reductions on the Indebtedness, *Id.* at ¶ 1(g), pg.

7; and (vi) prohibits the Bank from offsetting or sweeping the Debtor's accounts, *Id.* at ¶ 1(c), pg. 6.

11.  The Interim Cash Collateral Order also reserves the right of the Bank and Peninsula to seek a superpriority claim under Section 507(b) of the Code over all administrative expense s incurred in this chapter 11 case specified in Section 503(b) of the Code, other than quarterly fees owed to the Office of the United States Trustee ("UST").  The Interim Cash Collateral Order does not restrict or provide for disgorgement of the Debtor's administrative expenses, including professional fees, to the extent provided in the Budget; nevertheless, the Bank is permitted to seek disgorgement of such amounts if the Debtor was or will be in default under the Interim Cash Collateral or the Prepetition Loan Documents as a result of such payment.  *Id.* at ¶ 3, pgs. 11-12.

12.  In addition, the Interim Cash Collateral Order provides various events of default and the rights to an expedited hearing on two (2) business days' notice, however, the Bank is not required to give notice of default under the Interim Cash Collateral Order to the Debtor or the Committee unless they are not aware of the default. *Id.* at ¶ 11, pg. 15.

13.  The Interim Cash Collateral Order fails to provide a mechanism for the Committee to review the loan documents and investigate and pursue any claims or causes of action against the Bank.  Moreover, the Interim Cash Collateral Order fails

to provide a carve out for Committee professionals, or even include a line item for fees and expenses incurred by such professionals in the current Budget on file with the Court [ECF No. 48].

## Argument

### I. The Proposed Adequate Protection Package is Unnecessary and Unwarranted.

14. The concept of "adequate protection" is defined in the Bankruptcy Code only by way of examples as set forth in section 361. That section provides in pertinent part:

> When adequate protection is required under section … 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash or periodic cash payments to such entity to the extent that ... any grant of a lien under section 364 of this title results in the decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; *or*
>
> (3) granting *such other relief,* other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361. (Emphasis supplied).

15. In addition to the examples of adequate protection set forth in the Bankruptcy Code, courts agree that a debtor may demonstrate adequate protection by proving the existence of an equity cushion. *See e.g. In re Phoenix Steel Corporation,* 39 B.R. 218, 224 (D. Del.1984); *In re Antinello,* 38 B.R. 609, 612 (Bankr. E.D. Pa.1984). Whether an equity cushion provides adequate protection to a secured creditor is determined on a case-by-case basis rather than by mechanical application of a formula. *See e.g., In re Kost,* 102 B.R. 829, 831 (D. Wy. 1989) (citing *In re McKillips,* 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987); *In re Tucker,* 5 B.R. 180 (Bankr. S.D.N.Y. 1980).

16. Nevertheless, the case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection. *See e.g., In re Franklin Equipment Co.,* 416 B.R. 483, 528 (Bankr. E.D. Va. 2009); *In re Kost,* 102 B.R. at 831; *see also In re San Clemente Estates,* 5 B.R. 605, 610 (Bankr. S.D. Cal. 1980) (65% is adequate); *In re Nashua Trust Co.,* 73 B.R. 423 (Bankr. D. N.J. 1987) (50% is adequate); *In re Ritz Theatres,* 68 B.R. 256 (Bankr. M.D. Ga. 1987) (38% is adequate); *In re Dunes Casino Hotel,* 69 B.R. 784, 796 (Bankr. D. N.J. 1986) (30% is adequate); *In re Helionetics,* 70 B.R. 433, 440 (Bankr. C.D. Cal. 1987) (20.4% is adequate); *In re Mellor,* 734 F.2d 1396, 1401 (9th Cir. 1984) (20% is adequate).

17. In this case, the Bank has a substantial equity cushion. The Schedules filed by the Debtor reflect that the Bank has a security interest in collateral worth

9

4870-0039-3314.v5    23-43403-mlo    Doc 83    Filed 05/09/23    Entered 05/09/23 08:15:10    Page 9 of 17

over $11 million, compared to its claim of $6,536,566.07 – more than a forty percent (40%) equity cushion. Additionally, the Bank asserts a lien on all of the other assets of the Debtor and also the Guaranty from Grossi for a portion of the Indebtedness up to $500,000.00 (the "<u>Guaranteed Amount</u>"), plus interest on the Guaranteed Amount and all expenses incurred by the Bank.

18. Despite this equity cushion, the Interim Cash Collateral Order proposes to provide the Bank with additional adequate protection in the form of: (i) replacement liens on all of the Debtor's post-petition assets, (ii) monthly payments of interest of approximately $43,856.00, (iii) permanent reductions in the Indebtedness from cash proceeds of any unusual or extraordinary amounts (exclusive of accounts receivable) received by the Debtor, and (iv) payment of the Bank's professional fees and costs associated with this bankruptcy case.

19. Such an adequate protection package is unnecessary and unwarranted. Courts have noted that secured creditors are only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case. *In re Gunnison Ctr. Apts., L.P.,* 320 B.R. 391, 396 (Bankr. D. Colo. 2005); *In re Elmira Litho, Inc.,* 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994). A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled." *In re Blehm Land & Castle Co.,* 859 F.2d 137 (10th Cir. 1988).

10
4870-0039-3314.v5
23-43403-mlo    Doc 83    Filed 05/09/23    Entered 05/09/23 08:15:10    Page 10 of 17

20. In this case, the equity cushion enjoyed by the Bank is more than sufficient to adequately protect it. The Committee should not be constrained by these concessions on a final basis. *See e.g., In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D. N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors."), strip assets from the Debtor to be able to successfully operate and reorganize under chapter 11.

## II. The Committee Must Be Allowed to Complete a Meaningful Investigation of the Bank in a Compressed Timeline.

21. The Interim Cash Collateral Order does not provide the Committee with the ability to investigate the validity, perfection and priority of the secured claims of the Bank. While the Committee is willing to be flexible and perform its investigation within sixty (60) days from its appointment, in order to do so, it needs to be given the tools to permit it to exercise its fiduciary duties.

22. First, Paragraph 4, pg. 12, of the Interim Cash Collateral Order attempts to validate that the Bank has a "first, valid and perfected" secured claim "as against all third parties upon entry of this Order." However, no determination as to the validity, priority or amount of the Bank's claim has yet been determined by this Court.

23. Second, the Interim Cash Collateral Order fails to provide a mechanism for the Committee to review the loan documents and investigate and pursue any

11

claims or causes of action against the Bank. The Committee having only recently been appointed just requested the Bank to provide it with the loan documents. The Committee has not yet had sufficient time to conduct more than a cursory review of such documents or investigate the pre-petition relationship between the Bank and the Debtor to determine whether claims, causes of action or claim objections should be pursued.

24. The Committee has proposed a period of sixty (60) days from its appointment, or until June 30, 2023, to perform a proper review of the claims of the Bank and any potential causes of action the Debtor may have against the Bank. In order to assist the Committee in performing a proper review of the Indebtedness in this sixty (60) day period and properly situate itself to initiate a timely challenge, if appropriate, the Committee respectfully submits that the final order authorizing cash collateral should provide the Committee with standing to commence an adversary proceeding or to file any other pleading with this Court asserting an objection or defense with respect to the liens and claims of the Bank or pursue any causes of action against the Bank related to its pre-petition conduct. Requiring the Committee to file a motion seeking authority to assert a challenge is an unnecessary expense which will further diminish the limited funds and time period allotted to the Committee to perform its review. Further, requiring the Committee to file a motion seeking such standing is wasteful of economic and judicial resources.

25. Accordingly, the Committee requests that the Interim Cash Collateral Order be revised to provide that the Committee have until June 30, 2023 to review and, as appropriate, file with the Court an objection to the validity, perfection or priority of any lien or claim of the Bank or pursue any other claims or causes of action against the Bank. The order should further provide that the Committee is granted standing and authority to bring such an action against the Bank without further motion seeking authority to bring such actions and without further order of the Court. Additionally, the order should provide that if any such objection is timely filed and successfully pursued, nothing in the Interim Cash Collateral Order shall prevent the Court from granting appropriate relief with respect to the Indebtedness or the liens and security interests in favor of the Bank in the Collateral, including the disgorgement or repayment of any funds paid to or received by the Bank.

26. Finally, the Bank further seeks to limit the role of the Committee in this case by refusing to provide a carve out or even a reasonable line item in the Budget for fees and expenses incurred by professionals retained by the Committee. The Budget provides for the payment of various administrative expenses of the Debtor but fails to allocate any fees for the Committee professionals.

27. Section 1103(a) of the Bankruptcy Code authorizes the Committee to select professionals to perform services for the Committee. 11 U.S.C. § 1103(a). Subsection (c) of section 1103 sets forth various powers and duties of a committee,

including consulting with the debtor regarding the administration of the estate, investigating "the acts, conduct, assets, liabilities, and financial condition of the debtor" and performing such other services as are in the interest of those represented. 11 U.S.C. § 1103(c). A committee also has a duty to communicate with its constituents under section 1102 of the Bankruptcy Code. None of these duties can be adequately fulfilled in this case if the Committee's professionals have no funding to carry out these duties.

**III.  The Budget is Woefully Inadequate and Fails to Pay Administrative Expenses Upon Termination.**

28. The Budget is woefully inadequate to fund the operations of the Debtor. The Interim Cash Collateral Order provided the Debtor with access to only $1,556,049 in cash to operate its business. The Committee understands that this is an insufficient amount of cash for the Debtor to operate the business, fund all administrative expenses and maximize the value of the assets of the estate for all stakeholders. Indeed, the Committee is concerned that the Bank's failure to provide for the payment of all administrative expenses in the Budget will create an administratively insolvent estate.

29. Finally, in the event that the Debtor defaults in performance of any of its obligations under the Interim Cash Collateral Order or the Prepetition Loan Documents, the Debtor's right to use cash collateral terminates with a limited cure period for the Debtor to cure curable defaults, and without notice, unless the

14

Committee and the Debtor were not aware of the default, and to request an expedited hearing within two business days to seek relief from the automatic stay. *See* Interim Cash Collateral Order, ¶ 3, pgs. 13-14. The Interim Cash Collateral Order does not provide the Debtor with even the right to contest the occurrence of a default prior to the termination of its ability to use cash collateral. *Id.*

30. Paragraph 11 of the Interim Cash Collateral Order likewise provides that, upon a default by the Debtor, the Debtor's authorization to use cash collateral terminates. Paragraph 8 further provides that after the termination date, the only permitted use of cash collateral shall be quarterly payments due the UST. There is no provision for payments to other budgeted administrative claimants who have enhanced the estate prior to the termination date. Furthermore, to the extent that the payment of such expenses authorized under the Budget are paid at a time when the Debtor is in default or such payment will create a default, then the payment of such amounts is subject to disgorgement. At a minimum, the Interim Cash Collateral Order should provide that these expenses can be paid from cash collateral to the same extend that they would have been paid under the Budget and further preclude disgorgement of the payment of budgeted expenses.

31. The payment of these administrative expenses is necessary because, although the Bank is oversecured by all of its Collateral, there is a real risk of administrative insolvency in this particular case. Accordingly, it is imperative that,

upon the termination of cash collateral, any outstanding administrative claims incurred prior to the termination date be paid as an authorized use of cash collateral to the extent that they were provided for in the Budget.

**WHEREFORE**, the Committee requests that the Court deny the entry of the Interim Cash Collateral Order as a final order or condition the entry of such order on its modification as set forth herein.

Respectfully submitted by,

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ *Judith Greenstone Miller*
Judith Greenstone Miller (P29208)
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
Facsimile: (248) 351-3082
jgmiller@taftlaw.com
kclayson@taftlaw.com

*Proposed Attorneys for the Official Committee of Unsecured Creditors*

Dated: May 9, 2023

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

In re:

ARK LABORATORY, L.L.C.,

      Debtor.

_____/

Case No. 23-43403
Chapter 11
Hon. Maria L. Oxholm

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2023, I electronically filed the Official Committee of Unsecured Creditors' Objection to the Order Authorizing Interim Use of Cash Collateral and Granting Adequate Protection with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this case.

Respectfully submitted by,

**TAFT STETTINIUS & HOLLISTER LLP**

By: /s/ *Judith Greenstone Miller*
Judith Greenstone Miller (P29208)
Kimberly Ross Clayson (P69804)
27777 Franklin, Suite 2500
Southfield, MI 48034
(248) 351-3000
jgmiller@taftlaw.com
kclayson@taftlaw.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

Dated: May 9, 2023

17