<div align="center">

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

</div>

In the Matter of:

ARK LABORATORY, LLC,                Case No. 23-43403-mlo
                                 Chapter 11
          Debtor.               Hon, Maria L. Oxholm

_____/

<div align="center">

**COVER SHEET FOR MOTION TO APPROVE SALE PROCEDURES ORDER**

</div>

The debtor has filed a motion for approval of procedures for the sale of assets, which is attached to this cover sheet. Pursuant to E.D. Mich. L.B.R. 60041, the debtor has identified below, by page and paragraph number, the location in the proposed Sale Procedures Order accompanying the motion of each of the following provisions:

| PROVISION | Contained in proposed order | Location in proposed order |
|---|---|---|
| (1) Provisions concerning the qualifications of the bidding parties. | _x_ Yes <br> ____ No | Page _3__, ¶4 |
| (2) Provisions concerning the criteria for a qualifying bid and any deadlines for (i) submitting such a bid, and (ii) notification of whether the bid made constitutes a qualifying bid. | _x_ Yes <br> ____ No | Page _3__, ¶ _3__ In Exhibit C Bidding Procedures Page _3__, ¶ _2__ |
| (3) Provisions that require qualified bids to identify points of variation from the stalking horse bid (including price and other terms). | _x_ Yes <br> ____ No | In Exhibit C Bidding Procedures Page _2__, ¶ _1_ |
| (4) Provisions pertaining to the conditions to the qualified bidders' obligation to consummate the purchase (including the time period within which the purchaser must close the transaction). | _x_ Yes <br> ____ No | In Exhibit C Bidding Procedures Page _5__, ¶ _4__ |
| (5) Provisions pertaining to the amount required for a good faith deposit. | _x_ Yes <br> ____ No | In Exhibit C Bidding Procedures Page _3__, ¶ 4 |

| | | |
|---|---|---|
| (6) Provisions that relate to a "Back-Up Buyer" should the first winning bidder fail to close the transaction within a specified period of time. | __x___ Yes<br><br>_____ No | In Exhibit C Bidding Procedures<br>Page _5__, ¶ _4__ |
| (7) No-shop or No-Solicitation provisions including the justification for such provision. | _____ Yes<br><br>__x___ No | Page ___, ¶ ___ |
| (8) Provisions relating to BreakUp fees, Topping fees, and/or Expense Reimbursement (including the waiver of such fees due to rebidding). | _____ Yes<br><br>__x___ No | Page ___, ¶ ___ |
| (9) Provisions specifying the bidding increments. | __x___ Yes<br><br>_____ No | Page _5__, ¶ _8__ |
| (10) Provisions relating to auction procedures including manner in which auction is to be conducted and when the auction will be open and when it will close. | __x___ Yes<br><br>_____ No | Page _4__, ¶ _5__ |
| (11) Provisions relating to whether the auction will occur and the termination of the auction process and/or sale. | __x___ Yes<br><br>_____ No | Page _4__, ¶ _5__ |
| (12) Provision whether 14 day stay of F.R.Bankr.P. 6004(h) and 6006(d) is waived. | __x___ Yes<br><br>_____ No | Page _6__, ¶ _14__ |
| (13) Provisions regarding timing for notice, submission of bids, objections to sale and other key events. | __x___ Yes<br><br>_____ No | Page 4___, ¶ __6_ |

Respectfully submitted,

__/s/ Robert Bassel _____
ROBERT N. BASSEL (P48420)
Attorneys for Debtor
P.O. Box T
Clinton, MI 49236
(248) 677-1234
bbassel@gmail.com

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In the Matter of:

ARK LABORATORY, LLC,                        Case No. 23-43403-mlo
                                            Chapter 11
        Debtor.                            Hon, Maria L. Oxholm
_____/

## MOTION TO APPROVE (1) BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (2) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105(A) AND 363; (3) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; AND (4) GRANTING RELATED RELIEF

Pursuant to Sections 105(a), 363, and 365 of title 11, United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure, (the "Bankruptcy Rules"), Ark Laboratory, LLC (the "Debtor" and "Seller"), hereby requests that this Court enter orders authorizing and approving (i) bidding procedures and a form of asset purchase agreement relating to the Debtor's sale of substantially all of its assets; (ii) the sale of substantially all of the Debtor's assets free and clear of all liens, claims, interests and encumbrances to Auxo Investment Partners, LLC ("Auxo" and "Buyer"), subject to higher and better bids; (iii) the assumption and assignment

of executory contracts and unexpired leases; and (iv) other related relief. In support of its Motion, the Debtor respectfully represents as follows:

## Background and Jurisdiction

1. The Debtor is a CLIA certified, CAP proficient, COLA accredited, medical laboratory in Waterford, Michigan. Debtor specializes in substance abuse, blood and molecular testing.

2. On April 12, 2023, (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3. The Debtor continues to manage and operate its business as a Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. No trustee or examiner has been appointed in the Debtors' chapter 11 case. An unsecured creditors committee (the "Creditors' Committee") was appointed by the Office of the United States Trustee ("UST") on May 1, 2023 [ECF Nos. 68 and 70].

5. The statutory predicates for relief requested herein are 11 U.S.C. §§ 105(a), 363, and 365.

## Proposed Sale of Assets

6. The Debtor has now received an offer to purchase substantially all of its assets (the "Property") through a sale conducted under Section 363 of the Bankruptcy Code.

7. The offer is memorialized in an Asset Purchase Agreement (the "Agreement") dated June 22, 2023 between the Debtor and Auxo for the sale and purchase of the Property. A copy of the Agreement is attached as **Exhibit A.**

8. Prior to the Petition Date, the Debtor entered into a master revolving note, a security agreement and a forbearance agreement with Comerica Bank ("Comerica") and a personal guaranty (the "Guaranty") with Jim Grossi ("Grossi"), a principal and the managing member of the Debtor that granted Comerica Bank a security interest and lien on substantially all of the Property (collectively, the "Comerica Loan Documents")

9. As of the Petition Date, the Debtor owed Comerica $6,536,566.07, comprised of principal in the amount of $6,376,908.51, interest of $23,360.32, plus costs, fees and expenses that continue to accrue (the "Indebtedness").

10. Debtor is obligated to The Peninsula Fund VII Limited Partnership ("Peninsula") under a certain Note Purchase Agreement and other loan and collateral documents ("Subordinate Loan Documents"). The liabilities evidenced by the Subordinate Loan Documents, including interest, costs, fees and expenses, are identified as the "Subordinate Debt".

11.     As of the Petition Date, the Debtor owed Peninsula no less than $14,940,749.14, plus costs, fees and expenses that continue to accrue (the "Subordinated Indebtedness").

12.     Auxo acquired the Indebtedness from Comerica and the Subordinated Indebtedness from Peninsula such that it is now the primary lender and secured creditor of the Debtor, with a first perfected lien in all of the Property of the Debtor.  Auxo, however, is not an affiliate of the Debtor and neither it nor any of its owners are related to the Debtor.

13.     The Debtor hereby requests authority to sell to Auxo the Property free and clear of liens, claims, interests and encumbrances.  As a preliminary matter, the Debtor requests the entry of an order establishing the procedures for conducting the proposed sale (the "Sale Procedures Order"), the form of which is attached to this Motion as **Exhibit B**.  The Sales Procedure Order seeks approval of: (i) the form of the Purchase and Sale Agreement and (ii) certain bidding procedures (the "Bidding Procedures"), a copy of which is attached to this Motion as **Exhibit C**, for the auction of the Property.

14.     The Debtor also requests that the Court approve the form of notice to all creditors of the sale (the "Notice of Sale"), attached to this Motion as **Exhibit D.**

15.     The Debtor also requests that the Court approve the form of notice of assumption of executory contracts and unexpired leases (the "Notice of Assumption"), attached to this Motion as **Exhibit E.**

16.     The Debtor hereby requests that the Court schedule a hearing on June 29, at 11:00 a.m. Eastern Prevailing Time, or as soon thereafter as the Court is available, to approve the Bidding Procedures, Notice of Sale, and Notice of Assumption.

17.     Additionally, the Debtor requests that this Court schedule a hearing on August 3, 2023 at 11:00 a.m. Eastern Prevailing Time, or as soon thereafter as the Court is available (the "Sale Hearing"), to approve the sale of the Property to the highest bidder pursuant to the Bidding Procedures.  The Debtor requests that the Court enter an order at the Sale Hearing substantially in the form attached to this Motion as **Exhibit F** (the "Sale Order") authorizing the Debtor to sell the Property free and clear of all liens, claims, interests and encumbrances on substantially the same terms and conditions as are set forth in the Agreement.

A.     **The Agreement**

18.     The Debtor and Auxo have reached agreement regarding the terms of the sale of the Property to Auxo, as reflected in the Agreement, attached as **Exhibit A.** The principal terms and conditions of the Agreement are as follows:[1]

a.      At the Closing,[2] on and subject to the terms and conditions of the Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell, assign, transfer, convey and deliver to the Buyer, except for the Excluded Assets set forth on Schedule A, all of the assets of the Seller, wherever located, including without limitation assets of the types described on Schedule B hereto (the "Purchased Assets").

b.      Under the Agreement, Auxo is not paying cash but rather as the secured creditor of the Debtor is making a credit bid in the amount of $6,536,566.07 to acquire the Property, subject to higher and better offers.

c.      Under the Agreement, Auxo is also agreeing to assume certain executory contracts and unexpired leases pursuant to Section 365 of

---

[1] Reference should be made to the Agreement for all the terms and conditions. To the extent of any inconsistency between the summary description contained below and the Agreement, the Agreement shall control.

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement.

6

the Bankruptcy Code, subject to agreeing to pay such cure amounts that may be due to such counterparties as of the Petition Date.

d. Under the Agreement, Auxo is assuming certain liabilities, as expressly provided for therein.

**B.** **Proposed Bidding Procedures**

19. In order to insure the highest and best offer for the Property, the Debtor has developed the Bidding Procedures as a means of allowing competitive bidding. As set forth more specifically in the Bidding Procedures, in order to participate in the sales process, a party must first execute a nondisclosure agreement in a form acceptable to the Debtor to be considered a potential bidder (a "Potential Bidder").

20. To be deemed a Qualified Bidder, the Potential Bidder must submit its bid to (i) the Debtor, (ii) counsel for the Creditors' Committee, (iii) counsel for the UST, and (v) Auxo, no later than 4:00 p.m. Eastern Prevailing Time on July 28, 2023 (the "Bid Deadline"), which bid must include evidence of the Potential Bidder's ability to close on a sale of the Property on or before August 4, 2023, and also a Two Hundred Thousand and 00/100 Dollars ($200,000.00) deposit, in the form of a cashier's check or wire transfer (or other form acceptable to the Debtor in its sole discretion), payable to the Debtor's Bankruptcy Estate and delivered to O'Keefe & Associates, Attn. Russell D. Long, the Debtor's financial adviser (the

7

"Debtor's Financial Advisor") to be held in escrow (the "Deposit" and, collectively with the other items described above, the "Bid Package"). Only "Qualified Bidders" will be permitted to participate in the sales process.

21. After reviewing any Bid Packages, the Debtor, in consultation with the Creditors' Committee, will determine who is a "Qualified Bidder" for the Property. Under the Bidding Procedures, a Qualified Bidder is a Potential Bidder that delivers the Potential Bid Package to the Debtor and the Deposit to the Debtor's Financial Advisor, that the Debtor, in consultation with the Creditors' Committee, determines is reasonably likely to close on a sale of the Property on or before August 4, 2023, if selected as the successful bidder. Auxo is automatically deemed a Qualified Bidder based on its willingness to act as stalking horse bidder in connection with the auction for the Property, its status as the first perfected secured creditor in the Property, and the Debtor's prior determination of Auxo's financial qualifications.

22. Auxo, having already submitted its bid for the Property in the form of its entry into the Purchase and Sale Agreement, shall not be required to submit any additional bid, but may submit an additional bid in response to the bid of any other Qualified Bidder on or before the Bid Deadline. To the extent Auxo submits an additional bid in response to the bid of any other Qualified Bidder, the Debtor shall share the terms of such additional bid of Auxo with the other Qualified Bidders and

8

the Creditors' Committee. The Debtor may extend the Bid Deadline once or successively, but is not obligated to do so. All initial bids by Qualified Bidders, other than Auxo, must also include the following documents (the "Required Bid Documents"):

a. A letter stating that the Bidder's offer is irrevocable until thirty (30) days after the Sale Hearing, currently scheduled for August 3, 2023.

b. An executed copy of an asset purchase agreement in a form substantially the same as the Agreement. Any changes to the Agreement must be (i) non-material, (ii) made to and marked on such form of agreement, and (iii) agreed to by the Debtor after consultation with the Creditors' Committee. The agreement cannot contain any consideration, other than cash and assumption of liabilities of the Debtor, and shall not be subject to any financing or other conditions not set forth in the Agreement.

c. Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Debtor, after consultation with the Creditors' Committee.

d. Written acknowledgment that the bid is not subject to due diligence review, board approval, obtaining financing, or the receipt of any non-governmental consents.

23. After all Qualified Bids have been received, the Debtor intends to conduct an auction (the "Auction") with respect to the Property if a Qualified Bid other than that of Auxo has been received. Subject to the Court's approval, the Auction shall take place July 31, 2023, at 10:00 a.m. at the offices of Miller Johnson, 500 Woodward Avenue, Suite 2800, Detroit, MI 48226, or such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. Only Auxo and any other Qualified Bidders who have submitted the Required Bid Documents in form and substance satisfactory to the Debtor, after consultation with the Creditors' Committee, by the Bid Deadline will be eligible to participate in the Auction. Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Property, and such other information as the Debtor, after consultation with the Creditors' Committee, determines is relevant, the Debtor, in consultation with the UST and the Creditors' Committee, will conduct the Auction in the manner it determines will result in the highest or otherwise best offer for the Property. If there is not a timely Qualified Bidder other than Auxo, then Auxo shall be deemed the Successful Bidder, and the Auction shall not be held.

24. If an Auction is held, upon the Auction's conclusion, the Debtor, in consultation with its advisors, representatives of the Creditors' Committee and the UST shall (i) review each Qualified Bid on the basis of financial and contractual

terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest and otherwise best offer (the "<u>Successful Bid</u>").  At the Sale Hearing, the Debtor shall present the Successful Bid to the Court for approval.

25.    If the Successful Bidder fails to consummate the transaction by the Closing Date, as defined in Agreement, the Debtor shall (i) retain such bidder's Deposit; and (ii) be free to consummate the proposed sale of the Property with the next highest and best bidder (the "<u>Back Up Bidder</u>") at the final price bid by the Back Up Bidder at the Auction (the "<u>Back Up Bid</u>") (or, if that competing bidder is unable to consummate the purchase of the Property at that price, the Debtor may retain such Back Up Bidder's deposit and then consummate the transaction with the next highest and best competing bidder, and so forth) without the need for an additional hearing or order of the Court.

### C.    <u>Notice of Sale</u>

26.    Within one (1) business day after entry of the Sale Procedures Order, the Debtor will serve the Notice of Sale on all of its known creditors by first class United States mail, postage prepaid, and also serve the Notice of Sale and the Bidding Procedures by first class, United States mail, postage prepaid, upon (i) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Property; (ii) all federal, state, and local regulatory or taxing authorities or

recording offices which have a reasonably known interest in the relief requested herein; (iii) counsel for the Creditors' Committee; (iv) counsel for the UST, (v), counsel for the United States Department of Justice, (vi) counsel for the Internal Revenue Service; (vii) counsel for Auxo; (viii) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (ix) all parties known to the Debtor to have expressed an interest in acquiring the Property and other potential purchasers. If any of the above entities receive electronic notices through the ECF system, Debtor may email the relevant documents to those entities, or file the relevant documents on the Court's ECF website so that those entities get notice through the Court's ECF noticing system.

### D.  <u>Executory Contracts and Unexpired Leases</u>

27.     Within one (1) business day after entry of the Sale Procedures Order, the Debtor will serve the Notice of Assumption of Executory Contracts and Unexpired Leases on all of its known creditors by first class United States mail, postage prepaid, and also serve (i) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Property; (ii) all entities known to have executory contracts with the Debtor (iii) counsel for the Creditors' Committee; (iv) counsel for the UST, (v) counsel for Auxo; (vi) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (vii) all parties known to the Debtor to have expressed an interest in acquiring the Property and other

potential purchasers. If any of the above entities receive electronic notices through the ECF system, Debtor may email the relevant documents to those entities, or file the relevant documents on the Court's ECF website so that those entities get notice through the Court's ECF noticing system.

## **Legal Authority**

### A. **Sales Outside the Ordinary Course of Business**

28.     Section 363 of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b).  To approve the use, sale or lease of property outside the ordinary course of business, this Court need only determine that the Debtor's decision is supported by "some articulated business justification."  *See, e.g., Stephens Ind., Inc. v. McClung,* 789 F.2d 386, 389-90 (6th Cir. 1986); *Fulton State Bank v. Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F2d 1063, 1070 (2d Cir. 1983); *see also In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Telesphere Communications, Inc.,* 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D.Del. 1991).

29.     Once the debtor articulates a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the

13

directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company,* 186 B.R. 98 (Bankr. N.D. Ill. 1995); *In re Integrated Resources. Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.")

30.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981).  Accordingly, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefore. *See Stephens Ind., Inc.,* 789 F.2d at 389-90; Schipper, 933 F.2d at 515; *In re Lionel Corp.,* 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.,* 124 B.R. 169 at 179.

31.     While the holding of *Stephens Industries* merely requires articulation of a sound business justification for a sale outside the ordinary course of business, other courts have offered additional guidance by citing various factors that they consider in determining whether a sound business justification exists. These factors include: (i) whether a sound business reason exists for the proposed transaction; (ii) whether adequate consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and

14

reasonable notice is provided. *See Abbotts Dairies of Pa., Inc.*, 788 F.2d 143; *Plabell Rubber Prods., Inc.*, 149 B.R. 475, 479 (Bankr. N.D. Ohio 1992) (citing *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991)).

32. The Debtor has a sound business justification for selling the Property at this time, namely that the Property must be sold in order to maximize the value of the assets as a going concern, and the Debtor believes that the value of the assets will drastically decline if Debtor is unable to secure post-petition financing through a further cash collateral order or debtor in possession financing, each of which is likely to be contested or unavailable.

33. Additionally, the terms of the sale of the Property that the Debtor has reached with Auxo were proposed and negotiated in good faith, the consideration proposed to be paid by Auxo is adequate and reasonable under the circumstances and the Debtor proposes to provide reasonable notice of the proposed sale under the Bidding Procedures. For these reasons, the Debtor has determined, in the exercise of its business judgment, that the most viable option for maximizing the value of the estate is through a sale of the Property in the manner and in the time frame set forth in the Bidding Procedures. The Debtor's request for approval to sell the Property in accordance with the Bidding Procedures should be allowed accordingly.

**B.** **Sales Free and Clear of Liens, Claims and Encumbrances**

34. Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things: (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

35. Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, the Debtor's satisfaction of any one of its five requirements will be sufficient to permit the sale of the Property free and clear of all liens, claims, and encumbrances. *See Mich. Empl. Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co*.), 930 F.2d 1132, 1147 n.24 (6th Cir. Mich. 1991). The Debtor believes that the primary entity holding a lien on the Property is Auxo, who is also the proposed Stalking Horse Bidder that is credit bidding its debt to acquire the Property.

36. Moreover, all holders of interests can be compelled to accept a money satisfaction of their liens in legal or equitable proceedings in accordance with Section 363(f)(5) of the Bankruptcy Code. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of

16

a lien may be compelled to accept payment in satisfaction of its lien pursuant to 11 U.S.C. § 1129(b)(2)(A).

37.     Indeed, Section 1129(b)(2)(A) of the Bankruptcy Code specifically allows a debtor-in-possession to sell property subject to a lien, free and clear of such lien, if such lien attaches to the net proceeds of the sale, subject to any claims and defenses the debtor may possess with respect thereto. The Debtor proposes that any liens in the Property attach to the net proceeds of the proposed sale.

**C.     Assumption, Assignment and Rejection of Executory Contracts and Unexpired Leases Under Section 365 of the Bankruptcy Code**

38.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.* , 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.* , 872 F. 2d 36, 39-40 (3d Cir. 1989). The

business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling- Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)* , 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

39.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Center, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Doge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets). Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract...only

18

if the trustee assumes such contract...and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

40.     Upon the Closing, Purchaser will have financial resources that are sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtor and assigned to Purchaser at the Closing. Moreover, if necessary, the Debtor will adduce facts at the hearing on any objection demonstrating the financial wherewithal of Purchaser or any Successful Bidder,

and their willingness and ability to perform under the contracts to be assumed and assigned to them.

41.     The procedures for assumption and assignment of executory contracts and unexpired leases set forth in the Sale Procedures Order are appropriate and reasonably tailored to provide counterparties to Debtor Contracts with adequate notice of the proposed assumption and assignment of their applicable contract, as well as proposed Cure Costs, if applicable. Further, to the extent that any defaults exist under any Debtor Contracts, the Debtor will cure any such default as provided herein.

### D.     **Good Faith Purchaser Finding and Immediate Effectiveness of Sale Order**

42.     The Successful Bidder should be afforded all protections under 11 U.S.C. § 363(m) as a good faith purchaser.  Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) and (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith…"  11 U.S.C. § 363(m).

43.     The Agreement with Auxo constitutes an arms' length transaction that was negotiated between unrelated parties.  Additionally, the Bidding Procedures have been designed to create a fair, open and level playing field to ensure that any

party interested in acquiring the Property by making sure a competing bid has every opportunity to do so.

44. Accordingly, the Debtor requests that the party submitting the Successful Bid be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code.

45. Further, because all parties have acted in good faith during this process and, once a Successful Bidder is identified, it is critical to maximizing the value of the Property that the sale be closed expeditiously, the Debtor respectfully requests that any Sale Order entered by the Court approving the sale to the Successful Bidder be immediately effective and any stay arising under Bankruptcy Rule 6004(h) be waived.

**E.    Summary of Events**

46. The following chart summarizes the proposed timeline for the sale process contemplated in the Sale Procedures Order and Sale Order.

| Event | Date | Action Required/Requested |
|---|---|---|
| Sale Procedures | June 29, 2023 | Court enters Sale Procedures Order |

| Event | Date | Action Required/Requested |
|-------|------|---------------------------|
| Sale Notice and Assumption Notice Service Deadline | June 30, 2023 | Deadline for Debtor to provide notice of sale and assumption of executory contracts. |
| Objection Deadline | July 27, 2023 | Deadline for any party to object to the sale or assumption of contracts. |
| Potential Bid Package Deadline | July 28 2023 at 4:00 p.m. (prevailing time) | Deadline to submit Deposit and materials required to qualify as bidder |
| Auction Date | July 31, 2023 | Auction Sale held at offices of Miller Johnson in Detroit, Michigan |
| Sale Hearing | August 3, 2023 | Court Approves Sale |
| Closing Date | August 4, 2023 | Sale Closes |

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter orders substantially in the forms annexed hereto: (i) approving the Bidding Procedures and the form of the Purchase and Sale Agreement relating to the sale of the Property; (ii) authorizing the Debtor's sale of the Property free and clear of liens, claims and encumbrances to Auxo subject to higher and better bids, (iii) authorizing the assumption and assignment of executory contracts and unexpired leases, and (iv) granting such other related relief.

Respectfully submitted;

/s/ Robert Bassel
Robert N. Bassel P48420
PO BOX T
CLINTON,  MI 49236
248.677.1234
bbassel@gmail.com
Counsel for Debtor

Dated:  June 23, 2023

ASSET PURCHASE AGREEMENT

between

ARK LABORATORY, LLC

and

AUXO INVESTMENT PARTNERS, LLC

Dated as of June 22, 2023

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT, is entered into on June 22, 2023, by and among ARK LABORATORY, LLC, dba Helix Diagnostics, a Michigan limited liability company (the "<u>Seller</u>") and AUXO INVESTMENT PARTNERS, LLC a Delaware limited liability company (the "<u>Buyer</u>").

WHEREAS, the Seller is engaged in the Business (as defined below);

WHEREAS, the Seller commenced a bankruptcy filing on April 13, 2023, pursuant to which Seller became a debtor and debtor in possession in such bankruptcy case chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>") to be filed in the United States Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>");

WHEREAS, Buyer desires to purchase from the Seller, and the Seller desires to sell to Buyer, subject to the approval of the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the assets of the Business (except specifically excluded assets), all on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the parties agree as follows:

<div align="center">

ARTICLE I

DEFINITIONS

</div>

<u>Definitions</u>.  The following terms shall have the following meanings for the purposes of this Agreement.

"<u>Acquisition Proposal</u>" means a proposal to acquire all, substantially all or any portion of the assets of the Business involving any Third Party and Seller.

"<u>Affiliate</u>" means, with respect to any specified Person, a Person that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"<u>Affiliated Group</u>" means any affiliated group within the meaning of Code §1504(a) or any similar group defined under a similar provision of state, local or foreign Law.

"<u>Agreement</u>" means this Asset Purchase Agreement, including all schedules hereto, as it may be amended from time to time.

"<u>Assignment and Assumption Agreement</u>" means the Agreement to be set forth as <u>Exhibit A</u> hereto prior to Closing in a form to be mutually agreed upon by Buyer and Seller.

"<u>Assumed Contract</u>" means any contract listed on <u>Schedule C</u>.

"<u>Authority</u>" means any governmental regulatory or administrative body, governmental agency, governmental subdivision or authority, any court or judicial authority, any governmental regulatory authority, whether foreign, national, federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any regulation.

"<u>Bankruptcy Code</u>" has the meaning set forth in the preamble.

"<u>Bankruptcy Court</u>" has the meaning set forth in the preamble.

"<u>Benefit Plans</u>" has the meaning set forth in <u>Section 3.19</u>.

"<u>Bill of Sale</u>" means that certain Bill of Sale, executed by the Seller, in a form to be mutually agreed upon by Buyer and Seller and attached as <u>Exhibit B</u> hereto prior to Closing.

"<u>Business</u>" means the business of clinical laboratory testing including, but not limited to, toxicology testing, pathogen detection, blood testing, molecular testing, and pharmacogenomics testing.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Chapter 11 Case</u>" means the case commenced by Seller under Chapter 11 of the Bankruptcy Code.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.4</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Confidential Information</u>" means any technical and/or business information that relates to the Business, that is (i) not already available to the public, (ii) not available or known from a third party rightfully in possession of such information, (iii) not independently developed without use of the Confidential Information, and (iv) is currently in the possession of the Seller or its Affiliates.

"<u>Contract</u>" means any contract, lease, commitment, understanding, sales order, purchase order, agreement, indenture, mortgage, note, bond, right, warrant, instrument, plan, permit or license, whether written or oral, that relates to the Business and to which Seller is a party.

"<u>Debtor</u>" means the Seller.

"<u>Disclosure Schedule</u>" has the meaning set forth in <u>Article III</u>.

"<u>Employee Benefit Plan</u>" means any (a) Employee Pension Benefit Plan, (b) Employee Welfare Benefit Plan, (c) retirement or deferred compensation plan, incentive compensation plan, stock plan, retention plan or agreement, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, insurance or hospitalization program or any other fringe benefit arrangements for any current or former employee, director, consultant or agent, whether pursuant to contract, arrangement, custom or informal understanding, which does not constitute an

employee benefit plan (as defined in Section 3(3) of ERISA), or (d) material fringe benefit or other retirement, bonus, or incentive plan or program.

"Employee Pension Benefit Plan" has the meaning set forth in Section 3(2) of ERISA.

"Employee Welfare Benefit Plan" has the meaning set forth in Section 3(1) of ERISA.

"Environmental Laws" means all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law concerning public health and safety, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any Hazardous Substances, materials or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation, each as amended and as now or hereafter in effect, including (but not limited to) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, as amended, the Resource Conservation and Recovery Act of 1976, as amended, the Toxic Substances Control Act of 1976, as amended, the Federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, as amended, any so-called "Superlien" law, and any other similar federal, state or local statutes.

"ERISA Affiliate" means, with respect to any Person, any other Person who, together with the first Person, is a member of a controlled group of corporations or a group of trades or businesses under common control within the meaning of Section 414(b) or (c) of the Code, or is otherwise treated as a single employer with the first Person under Section 414 of the Code.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means the assets set forth on Schedule A.

"Financial Statements" means the following:

(a)     the financial statements of the Seller for the fiscal years ended December 31, 2022 and 2023 (including all notes thereto), which are included in Schedule 3.5 consisting of the balance sheet at such dates and the related statements of earnings and cash flows for the twelve month periods then ended;

(b)     the financial statements of the Seller as of April 30, 2023 (which shall include, for comparative purposes, financial statements as of April 30, 2022), which are included in Schedule 3.5, consisting of the balance sheet at such date and the related statement of earnings for six month period then ended prepared consistently with the financial statements.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"<u>Governmental Entity</u>" means any supranational, national, federal, provincial, state, or local judicial, legislative, executive, administrative, or regulatory agency, or other governmental authority (or any department, agency, or political subdivision thereof).

"<u>Hazardous Substance</u>" means any material or substance which (a) constitutes a hazardous substance, toxic substance or pollutant (as such terms are defined by or pursuant to any Environmental Laws) or (b) is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Laws.

"<u>Healthcare Laws</u>" means all Laws pertaining to the healthcare regulatory matters applicable to the operations of Seller (including the rendering of professional healthcare services and obtaining payment for the same), including (a) licensure, certification, or registration requirements of all Governmental Entity relating to the service conducted or provided by Seller, including the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), the Federal Controlled Substances Act (21 U.S.C. § 801 et seq.) or any relevant applicable state Law, (b) the Medicare statute (Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq.), the Medicaid statute (Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.) and the regulations promulgated thereunder, including the Medicare Part D program and the Medicare Advantage program, the federal TRICARE statute (10 U.S.C. § 1071 et seq.), and any other federal, state, or local governmental healthcare programs, including applicable program requirements, (c) any criminal Laws relating to healthcare, including all criminal false claims statutes (e.g., 18 U.S.C. Sections 287 and 1001), (d) the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b, (e) HIPAA or Other Privacy Laws, (f) all Laws relating to health care fraud and abuse, including the civil False Claims Act of 1863 (31 U.S.C. Section § 3729 et seq.) (the "<u>False Claims Act</u>"), the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b) et seq.), the Stark Act (42 U.S.C. § 1395nn), and the Health Care Fraud Statute, 18 U.S.C. § 1347, (g) the Patient Protection and Affordable Care Act (Pub. L. 111-148) as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152) and the regulations promulgated thereunder, (h) all federal and state self-referral prohibitions and state anti-kickback, illegal remuneration, fee-splitting, corporate practice, provider conflict of interest Laws, (i) all applicable federal and state Laws applicable to the practice of pharmacy or other federal, state, and local Laws, and the regulations promulgated pursuant to such Laws, concerning the handling, storage or distribution of legend and non-legend drugs and devices, (j) all applicable federal and state Laws applicable to controlled substances, (k) all other applicable quality, safety certification, and accreditation standards and requirements, (l) all applicable federal and state Laws specifically applicable to the establishment, operation and licensure of an ambulatory surgery center; (m) all applicable federal and state Laws specifically applicable to the establishment, operation and licensure of an independent diagnostic testing facility; (n) all applicable federal and state law specifically applicable to the practice of physical therapy; and (o) any and all federal, state, or local Laws promulgated pursuant to such Laws related to coding, coverage, reimbursement, claims submission, billing, and collections related to reimbursement from any third party insurance payor, including Federal Healthcare Programs or otherwise related to insurance fraud.

"<u>Intellectual Property</u>" means (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), improvements thereto, and patents, patent applications, and patent disclosures, together with reissues, continuations, continuations-in-parts, divisions, provisional

<!-- DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB -->

applications, reexaminations, foreign related applications and foreign patents thereof, (b) trademarks, service marks, trade dress, logos, trade names, domain names and corporate names, together with translations, adaptations, derivations, and combinations thereof and including goodwill associated therewith, and applications, registrations, and renewals in connection therewith, (c) copyrightable works, copyrights, and applications, registrations, and renewals in connection therewith, (d) mask works and applications, registrations, and renewals in connection therewith, (e) trade secrets and Confidential Information (including ideas, research and development, knowhow, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) computer software (including data and related documentation), (g) other proprietary rights, including without limitation all rights to recover for past infringements and (h) copies and tangible embodiments thereof (in whatever form or medium).

"<u>IRS</u>" means the Internal Revenue Service.

"<u>Knowledge of the Seller</u>" means to the Knowledge of the directors of the Seller including James A. Grossi.

"<u>Knowledge</u>" means actual knowledge after reasonable commercial inquiry.

"<u>Latest Balance Sheet</u>" means the balance sheet of the Seller dated as of April 30, 2023.

"<u>Law</u>" means any law, statute, regulation, ordinance, rule, order, decree, judgment, consent decree, settlement agreement or governmental requirement enacted, promulgated, entered into, agreed, enforced or imposed by any Authority.

"<u>Liability</u>" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including, without limitation, any liability for Taxes, environmental claims, pension liabilities, retiree health plans, breaches of any employment agreements, unfair labor practices or any breach of any other Law or agreement applicable to employment.

"<u>Lien</u>" means any mortgage, lien, charge, pledge, security interest, claim, right of any third party, easement, encroachment, encumbrance or restriction of any kind, whether voluntary or involuntary.

"<u>Major Customer</u>" means the 20 largest customers of the Business in terms of purchases during the twelve (12) months prior to Closing.

"<u>Major Supplier</u>" means the 10 largest suppliers of the Business in terms of purchases during the twelve (12) months prior to Closing.

"<u>Material Adverse Effect</u>" shall mean any circumstances, developments or matters whose effect on the Seller, properties, assets, results, operations and financial condition of the Business, either alone or in the aggregate, is or would reasonably expected to be materially adverse.

"Multiemployer Plan" has the meaning set forth in Section 3(37) of ERISA.

"Order" means any decree, order, injunction, rule, judgment, consent of or by an Authority.

"Ordinary Course of Business" means the ordinary course of business consistent with custom and practice of the Business from January 1, 2023 to the date hereof.

"Overbid Auction" means an auction held pursuant to and in accordance with the Sales Procedures Order.

"Permits" has the meaning set forth in Section 3.21.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Purchase Price" is defined in Section 2.2(a).

"Purchased Assets" is defined in Section 2.1.

"Sale Order" means an order of the Bankruptcy Court, in a form reasonably satisfactory to Buyer, under Sections 105, 363 and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby, (ii) approving the sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, and (iv) finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code. The "Sale Order" shall include the terms and conditions as set forth in the form of Exhibit C hereto.

"Sale Procedures Order" is the Order entered on or before June 29, 2023 by the Bankruptcy Court regarding sale procedures for the sale of Seller's assets.

"Schedules" means the disclosure schedules accompanying this Agreement.

"Seller Benefit Plan" means any Benefit Plan which is sponsored or maintained by the Seller.

"Seller" is defined in the Preamble.

"Subsidiary" means any corporation, partnership or limited liability company with respect to which the Seller (or a Subsidiary thereof) owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any Schedule or attachment thereto, and including any amendment thereof.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental

(including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or addon minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Topping Offer" means an Acquisition Proposal in which the amount bid for the Seller or the Purchased Assets exceeds the Purchase Price to be paid pursuant to this Agreement by at least $200,000.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, and any document executed in conjunction with or ancillary to the foregoing.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

SECTION II.1.     Basic Transaction.    At the Closing, on and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from Seller, and Seller agrees to sell, assign, transfer, convey and deliver to the Buyer, except for the Excluded Assets, all of the assets of the Seller, wherever located, including without limitation assets of the types described on Schedule B hereto (the "Purchased Assets").

SECTION II.2.     Purchase Price.

(a)     In consideration for the Purchased Assets, the Buyer shall pay in cash, an amount equal to the sum of Six Million Four Hundred and Ten Thousand Dollars ($6,376,908.51), plus amounts necessary to make all Cure Payments (as set forth herein in Section V.13) and to fund the Carve-Out (as defined in the Stipulated Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection at DN ___), and the waiver of any remaining claims Buyer acquired from Comerica Bank, N.A. ("Comerica") and/or Peninsula Fund VII Limited Partnership ("Peninsula") (the "Purchase Price").  The Purchase Price shall be paid to Seller by means of wire transfer of immediately available funds to an account or accounts designated by Seller.

SECTION II.3.     Payment of the Purchase Price.

(a)     The Purchase Price shall be paid via a credit in the amount of the Purchase Price against the Debtor-in-Possession financing Buyer obtained from Comerica, the full debt, secured and unsecured, of Peninsula and/or the transfer of the Purchase Price (or a portion thereof) in immediately available funds.

SECTION II.4.     The Closing.    The closing of the transactions contemplated by this Agreement (the "Closing") will take place remotely by the electronic exchange of executed Transaction Documents and will occur concurrently with the execution of this Agreement and each Transaction Document. The date on which Closing occurs is referred to as the "Closing Date" for tax and corporate purposes, Closing will be deemed effective as of the close of business on the Closing Date, unless otherwise agreed in writing by Buyer and Seller.

SECTION II.5.        Assumed Contracts; No Other Liabilities Assumed.  Subject to the terms and conditions set forth in this Agreement, Seller will assign and transfer to Buyer, effective as of the Closing Date, all of Seller's right, title and interest in and to, and Buyer will take assignment of and assume, the Assumed Contracts, each of which shall be deemed included in the term "Purchased Assets" as used herein; provided, however, (i) Buyer shall not assume or otherwise be liable or responsible for any Liability arising from, or related in any way to, any Assumed Contract during the period prior to the effective date of the assignment of such Assumed Contract to Buyer and (ii) prior to the assignment by Seller and the assumption by Buyer of any Assumed Contract, any and all payment defaults and material non-payment defaults under any such contract shall have been fully and completely cured by Buyer.  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Buyer will not assume any obligation or Liability of Seller other than the Assumed Contracts.  Without limiting the foregoing, Buyer will not assume any collective bargaining agreements, pension liabilities, retiree health plans or any environmental liabilities of Seller.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF
THE SELLER

Seller hereby represents and warrants to the Buyer that the statements contained in this Article III relating to Seller are correct and complete as of the date of this Agreement, and, except as amended pursuant to Section 5.8, will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article III), except as set forth in the disclosure Schedule attached to this Agreement (the "Disclosure Schedule"), which shall be deemed to be representations and warranties as if made hereunder.  The Disclosure Schedule will be arranged in paragraphs and/or sections corresponding to the Section numbers of this Agreement.  An item disclosed in any Schedule shall be deemed disclosed for purposes of all Schedules, provided that reasonably particular cross references have been included.  Seller hereby disclaims all warranties not specifically set forth in this Agreement, express or implied, including the implied warranties of merchantability or fitness for a particular purpose.

SECTION III.1.        Authorization of Transaction.  The Seller has full power and authority (including full corporate and authority) to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder, subject to Bankruptcy Court approval.  This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions, subject to issuance of the Sale Order and approval of the Bankruptcy Court.

SECTION III.2.        Title to Purchased Assets.

(a)        Ownership.  At the time of the conveyance of the Purchased Assets and upon entry of an Order of the Bankruptcy Court providing for the Sale free and clear of all liens, claims, interests and encumbrances,       the Seller is the sole and exclusive owner of and holds good and marketable title thereto, free of any Lien; and upon execution and delivery of the Bill of Sale, Buyer shall have all of the right, title and interest of the Seller in and to the Purchased Assets, free of any Lien.

(b) <u>Files</u>. The Seller will deliver to Buyer on the Closing Date all documents, certificates, agreements, instruments and files in its or its Subsidiaries' possession relating to each Purchased Asset (the "<u>Asset Files</u>").

SECTION III.3.       <u>Organization, Qualification, and Corporate Power</u>.  Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of its jurisdiction of organization listed on <u>Schedule 3.3</u>.  Seller is duly authorized to conduct business and is in good standing under the Laws of each jurisdiction listed on <u>Schedule 3.3</u> except where the failure to be so qualified would not have a Material Adverse Effect on Seller.  No Subsidiaries or Affiliates of the Seller conduct any operations related to the Business or own, or have the right to use, assets related to the Business.

SECTION III.4.       <u>Noncontravention</u>.   Neither the execution and the delivery of this Agreement and the Transaction Documents, nor the consummation of the transactions contemplated hereby and thereby, will (i) violate in any material respect any applicable constitution, Law, settlement agreement, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of the articles of incorporation or bylaws of Seller, or (ii) except as set forth on <u>Schedule 3.4</u> or except to the extent that such of the following occurrences would be pursuant to a provision in any agreement or applicable Law that is unenforceable as a result of the application of Section 365(f) of the Bankruptcy Code, as determined by the Bankruptcy Court, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any material Contract, lease, license, instrument, or other arrangement to which Seller is a party or by which Seller is bound or to which any of its assets is subject (or result in the imposition of any Lien upon any of its assets).  Except as set forth on <u>Schedule 3.4</u>, except for the issuance of the Sale Order or except to the extent that such of the following obligations would be pursuant to a provision in any agreement or applicable Law that is unenforceable as a result of the application of Section 365(f) of the Bankruptcy Code, as determined by the Bankruptcy Court,  Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

SECTION III.5.       <u>Financial Statements</u>. The Financial Statements of the Business and of the Seller are set forth on <u>Schedule 3.5</u>.  The Financial Statements have been prepared in accordance with GAAP consistently applied and present fairly in all material respects the financial position, assets and Liabilities of the Business and of the Seller as of the dates thereof and the revenues, expenses, results of operations of the Business and of the Seller for the periods covered thereby. Since December 31, 2023, there have been no changes in the accounting policies of Seller with respect to the Business. To the Knowledge of the Seller, neither Seller nor any of its directors, officers, employees or accountants has received or been made aware of any material complaint, allegation, assertion or claim regarding fraudulent or deficient accounting or auditing practices, procedures, methodologies or methods of Seller (with respect to the Business) or its internal accounting controls or any inaccuracy in the Financial Statements, except for suggestions contained in audit management letters received by Seller and disclosed and made available to Buyer.

SECTION III.6.    <u>Events Subsequent to Latest Balance Sheet</u>.  Since the date of the Latest Balance Sheet, other than the actions taken in connection with this Agreement and the Chapter 11 Case, there has not been any change in the business, financial condition, operations, or results of operations, which would have a Material Adverse Effect on the Business, <u>provided</u>, <u>however</u>, that for purposes of determining whether there has been any such Material Adverse Effect, any adverse change resulting from the taking of any action contemplated by this Agreement or set forth on <u>Schedule 3.6</u> of the Disclosure Schedule shall be disregarded.  Without limiting the generality of the foregoing, since that date:

(a)    neither the Seller nor its Subsidiaries has sold, leased, transferred, or assigned any of their assets, tangible or intangible, other than for a fair consideration in the Ordinary Course of Business;

(b)    except as set forth on <u>Schedule 3.6(b)</u>, neither the Seller nor its Subsidiaries has not entered into any Contract, lease, or license (or series of related Contracts, leases, and licenses) involving more than $25,000 or outside the Ordinary Course of Business;

(c)    no party (including the Seller and its Subsidiaries) has accelerated, terminated, modified, or canceled any agreement, Contract, lease or license (or series of related Contracts, leases and licenses) to which the Seller or its Subsidiaries is a party or by which it or they are bound outside the Ordinary Course of Business;

(d)    neither the Seller nor its Subsidiaries has cancelled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $25,000 or outside the Ordinary Course of Business;

(e)    neither the Seller nor its Subsidiaries has granted any license or sublicense of any rights under or with respect to any Intellectual Property;

(f)    there has been no change made or authorized in the articles of organization or operating agreement of the Seller or its Subsidiaries;

(g)    except for hourly employees, neither the Seller nor its Subsidiaries have granted any increase in the base compensation of any of its directors, officers, and employees or made any other change in employment terms for any of its directors, officers, and employees, in each case, with respect to those directors, officers and employees, whose annual compensation, including any bonuses, equals or exceeds $50,000. Except as set forth on <u>Schedule 3.6(g)</u>, no hourly employee wages have been increased.;

(h)    neither the Seller nor its Subsidiaries have adopted, amended, modified, or terminated any bonus, profitsharing, incentive, severance, or other plan, Contract, or commitment for the benefit of any of its directors, officers, and employees (or taken any such action with respect to any other Employee Benefit Plan);

(i)    there has not been any other occurrence, event, incident, action, failure to act, or transaction outside the Ordinary Course of Business involving the Seller or its Subsidiaries having a Material Adverse Effect; and

(j)    neither the Seller nor its Subsidiaries have committed to any of the foregoing.

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

**SECTION III.7.**      <u>Legal Compliance</u>.

(a)      Except as set forth on <u>Schedule 3.7(a)</u>, Seller and each Subsidiary has (i) complied in all material respects with and are not in material violation of all Laws of federal, state, local, and foreign governments (and all agencies thereof) to which the Purchased Assets are subject, including but not limited to those Laws whose application does or could result from consummation of the transaction contemplated by this Agreement and (ii) maintains, and during all applicable statute of limitation periods has maintained, in full force and effect any Permits necessary to the conduct of the Business as conducted as of such time. The Permits necessary to the conduct of the Business are set forth on <u>Schedule 3.7(a)</u>. Seller has not received any written or, to the Knowledge of Seller, oral notification from any Governmental Entity that has not yet been fully resolved asserting that Seller or the Purchased Assets is or may not be in compliance with any Law or Order in any material respect. Seller is in compliance in all material respects with all Permits set forth or required to be set forth on <u>Schedule 3.7(a)</u>. The consummation of the Sale will not violate or result in a default under, violation of or loss of a benefit under any such Permits. Seller has filed all material reports required to be filed by it pursuant to such Permits, and all such reports were complete and correct in all material respects when filed. There are no Actions pending or threatened in writing or, to the Knowledge of Seller, orally that seek the revocation, cancellation or adverse modification of any such Permit. During the past five (5) years, Seller has not received or been subject to any notice, claim or assertion alleging any violations of such Permits nor has any such notice, claim or assertion been threatened in writing or, to the Knowledge of Seller, orally during such period.

(b)      Neither Seller nor any of its managers, directors, officers or employees or, to the Knowledge of Seller, any of its consultants or agents, is or has been under: (i) any administrative, civil or criminal indictment or other Action by any Governmental Entity in connection with the Business; or (ii) any audit by any Governmental Entity in connection with the Business, other than as disclosed herein: [intentionally blank].

(c)      Seller is, and has at all times during the last six (6) years been, in compliance with all Healthcare Laws. To the Knowledge of Seller, Seller has not been subject to any audit, investigation, litigation, action, proceeding, or order by any Governmental Entity, other than as disclosed herein [intentionally blank]. No investigation or review by any Governmental Entity related to Healthcare Laws with respect to the Purchased Assets or the Business is pending or, to the Knowledge of Seller, threatened, nor, to the Knowledge of Seller, has any Governmental Entity indicated an intention to conduct the same, nor has Seller, nor any of the directors, officers, employees, agents, or contractors of Seller, received notice from any Governmental Entity of any pending or, to the Knowledge of Seller, threatened investigations, other than as disclosed herein: _[intentionally blank].

(d)      Except as set forth on <u>Schedule 3.7(d)</u>, neither Seller, nor any of its managers, directors, officers, or employees, is or has been subject to any Proceeding or Order by any Governmental Entity.

(e)      Seller (i) enrolled in, is qualified for participation in, and has all requisite provider names, group numbers, or authorizations to bill for services provided to patients of all Federal Healthcare Programs, (ii) is and has been in compliance in all material respects with the conditions of

participation of such programs, (iii) has submitted all required filings and documentation to such programs, and (iv) has received all approvals or qualifications necessary for reimbursement.

SECTION III.8.    <u>Tax Matters</u>.

(a)    All Tax Returns with respect to the Purchased Assets or income attributable therefrom that are required to be filed before the Closing Date have been timely filed or will be timely filed prior to the Closing Date, the information provided on such Tax Returns is or will be prior to the Closing Date complete and accurate in all material respects, and all Taxes whether or not shown to be due on such Tax Returns have been or will be prior to the Closing Date paid in full, to the extent that a failure to file such Tax Returns or pay such Taxes, or an inaccuracy in such Tax Returns, could result in the Buyer being liable for such Taxes or could give rise to a Lien on the Purchased Assets.

(b)    Neither Seller nor any Subsidiary thereof is transferring to the Buyer a "United States real property interest" as defined in <u>Section 897(c)</u> of the Code or is a "foreign person" as defined in Section 1445(f)(3) of the Code.

(c)    Except as set forth on <u>Schedule 3.8</u>, the Seller (A) has not been a member of an Affiliated Group filing a consolidated federal income Tax Return or (B) will not be required to pay the Taxes of any Person (other than the Seller) under Treas. Reg. §1.15026 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise.

SECTION III.9.    <u>Real Property</u>.

(a)    Other than as set forth on <u>Schedule A</u>, the Seller does not own any real property.

(b)    <u>Schedule 3.9(b)</u> lists and describes briefly all real property leased or subleased to the Seller (the "<u>Leased Property</u>").  Seller has delivered to the Buyer correct and complete copies of the leases and subleases and other agreements for occupancy, including all amendments, extensions and other modifications thereto ("<u>Leases</u>") with respect to each Leased Property, as listed in <u>Schedule 3.9(b)</u> (as amended to date). Except as otherwise set forth in <u>Schedule 3.9(b)</u> of the Disclosure Schedule, with respect to each Lease listed in <u>Schedule 3.9(b)</u>:

(i)    the lease or sublease is legal, valid, binding, enforceable, and in full force and effect except as such enforcement may be limited or prohibited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of rights generally and by general principles of equity (whether applied in a proceeding, at law or in equity);

(ii)    the lease or sublease will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby except as such enforcement may be limited or prohibited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of rights generally and by general principles of equity (whether applied in a proceeding, at law or in equity) and except as may result from actions of Buyer or its Affiliates;

(iii)     to the Knowledge of the Seller, no party to the lease or sublease is in breach or default, and no event has occurred which, with notice or lapse of time, would constitute a breach or default or permit termination, modification, or acceleration thereunder;

(iv)     to the Knowledge of the Seller, no party to the lease or sublease has repudiated any provision thereof;

(v)     there are no disputes, oral agreements, or forbearance programs in effect as to the lease or sublease;

(vi)     with respect to each sublease, the representations and warranties set forth in subsections (i) through (v) above are true and correct with respect to the underlying lease;

(vii)     neither the Seller nor a Subsidiary thereof has assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in the leasehold or subleasehold;

(viii)     all facilities leased or subleased thereunder have received all approvals of governmental Authorities (including licenses and permits) required in connection with the operation thereof and have been, in all material respects, operated and maintained in accordance with applicable Laws, rules, and regulations; and

(ix)     all facilities leased or subleased thereunder are supplied with utilities and other services necessary for the operation of said facilities in connection with the Business.

SECTION III.10.     Intellectual Property.  Seller owns, or is licensed or otherwise has the right to use all Intellectual Property used in or necessary for the conduct of the Business as currently conducted, (b) no claims are pending or, to the Knowledge of Seller,  threatened in writing that Seller is infringing on or otherwise violating the rights of any Person with regard to any Intellectual Property and (c) to the Knowledge of Seller, no Person is infringing on or otherwise violating any right of Seller with respect to any Intellectual Property owned by and/or licensed to any Seller. Schedule 3.10 identifies (a) patents, patent applications, all registered and unregistered trademarks, and all licenses, agreements or other permissions of Seller, (b) each material license, agreement or other permission which Seller has granted to any third party with respect to any Intellectual Property used in the Business and (c) each material item of Intellectual Property that any third party owns and that Seller uses in connection with the Business.  Any exclusive right to use any of the Intellectual Property used in or necessary for the conduct of the Business as currently conducted is valid and enforceable.

SECTION III.11.     Tangible Assets.  Each tangible asset included in the Purchase Assets has been maintained in accordance with normal industry practice, (taking into account the value and age of such tangible asset and the current condition and actual use of the same), is in good operating condition and repair (subject to normal wear and tear), is suitable for the purposes for which it presently is used and, to the Knowledge of Seller, is free from material defects (patent and latent). The Purchased Assets will be sufficient to permit the Buyer to operate the Business in substantially the same manner as conducted prior to and on the date hereof.

SECTION III.12.     Inventory.  The Inventory included in the Purchased Assets consists of items of a quality and quantity useable or saleable in the Ordinary Course of Business.  All items included

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

in such Inventory are the property of Seller. Other than as set forth in <u>Schedule 3.8</u>, no items included in such Inventory are held on consignment from or bailment for third parties.

SECTION III.13.    <u>Contracts</u>.    <u>Schedule 3.13</u> lists the following Contracts and other agreements to which the Seller is a party other than real estate leases and subleases which are set forth on <u>Schedule 3.9(b)</u> of the Disclosure Schedule and contracts relating to Intellectual Property rights listed on <u>Schedule 3.10</u>:

(a)    any Contract (or group of related Contracts) for the lease of personal property to or from any Person providing for lease payments in excess of $25,000 per annum;

(b)    any Contract (or group of related contracts) between the Seller and any Major Supplier;

(c)    any capitalized lease, pledge, conditional sale or title retention agreement;

(d)    any Contract concerning a partnership or joint venture;

(e)    any Contract with an employee, sales representative, manufacturer's representative, distributor, dealer, broker, sales agency, advertising agency or other Person engaged in sales, distributing or promotional activities, or any agreement to act as one of the foregoing on behalf of any Person;

(f)    any form of Contract concerning confidentiality or noncompetition or otherwise prohibiting the Seller from freely engaging in any business;

(g)    any Contract between Seller or any Affiliate thereof;

(h)    any license, royalty or other Contract relating to any material item of Intellectual Property;

(i)    any collective bargaining agreement;

(j)    any Contract for the employment of any individual on a fulltime, parttime, consulting, or other basis (other than for temporary contract employees);

(k)    any Contract, whether or not fully performed, relating to any acquisition or disposition of the Seller or any predecessor in interest or any acquisition or disposition of any subsidiary, division, line of business, or real property;

(l)    any Contract under which either Seller or a Subsidiary thereof has advanced or loaned any amount to any of its directors, officers, and employees;

(m)    any Contract under which the consequences of a default or termination could have a Material Adverse Effect on the business, financial condition, operations, results of operations, or future prospects of the Business;

(n)    any other Contract (or group of related Contracts) the performance of which involves consideration in excess of $25,000;

(o)    any commitment to do any of the foregoing.

14

Seller has delivered to the Buyer a correct and complete copy of each written Contract listed in Schedule 3.13 (as amended to date) and a written summary setting forth the terms and conditions of each oral Contract referred to in Schedule 3.13. Except as set forth on Schedule 3.13, with respect to each such Contract: (A) the Contract is legal, valid, binding, enforceable, and in full force and effect except as such enforcement may be limited or prohibited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of rights generally and by general principles of equity (whether applied in a proceeding, at law or in equity); (B) the Contract will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby except (i) as may result from actions of Buyer or its Affiliates, or (ii) as modification of terms set forth herein is required by an express provision of this Agreement; (C) neither Seller nor its Subsidiaries is in breach or default of, and to the Knowledge of Seller, no third party, is in breach or default of, and no event has occurred which with notice or lapse of time would constitute a breach or default of, or permit termination, modification, or acceleration under, the Contract; and (D) to the Knowledge of Seller, no party has repudiated any provision of the Contract.

SECTION III.14.     Notes and Accounts Receivable.  All notes and accounts receivable of the Seller arose from bona fide transactions in the Ordinary Course of Business.  All notes and accounts receivable are valid receivables and are current and collectible, subject only to the reserve for bad debts reflected in the Latest Balance Sheet (and noted on Schedule 3.14) as adjusted for operations and transactions through the Closing Date in accordance with the past custom and practices of the Seller, and to the Knowledge of the Seller, are not subject to any setoffs or counterclaims.

SECTION III.15.     Insurance.  Schedule 3.15 sets forth the following information with respect to each insurance policy (including policies providing property, casualty, Liability, and workers' compensation coverage and bond and surety arrangements) to which Seller or Subsidiaries thereof has been a party, a named insured, or otherwise the beneficiary of coverage relating to the Business:

(a)     the name, address, and telephone number of the agent;

(b)     the name of the insurer, the name of the policyholder, and the name of each covered insured;

(c)     the policy number and the period of coverage;

(d)     the scope  and amount of coverage; and

(e)     a description of any retroactive premium adjustments or other losssharing arrangements.

With respect to each such insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect except as such may be limited or prohibited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of rights generally and by general principles of equity (whether applied in a proceeding, at law or in equity); (B) neither the Seller, any Subsidiary thereof, nor, to the Knowledge of the Seller, any other party to the policy is in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred which, with notice or the lapse of time, would constitute such a breach

or default, or permit termination, modification or acceleration under the policy; and (C) to the Knowledge of the Seller, no party to the policy has repudiated any provision thereof. Schedule 3.15 describes any selfinsurance arrangements affecting the Seller. Schedule 3.15 sets forth all claims, if any, made against the Seller that are covered by insurance other than health insurance claims. Such claims have been disclosed to and accepted by the appropriate insurance companies and are being defended by such appropriate insurance companies. Except as set forth on Schedule 3.15, no claims have been denied coverage during the last five years.

SECTION III.16.     Litigation.  Schedule 3.16 sets forth each instance in which the Seller or a Subsidiary thereof (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge, (ii) within the past three (3) years was a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasijudicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, or (iii) is a party or, to the Knowledge of Seller, is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasijudicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator.  Neither Seller nor any Subsidiary thereof has any Liability with respect to any claims or, to the Knowledge of Seller, threatened claims by third parties relating to any sale or proposed sale of the Seller (whether structured as a sale of stock, a sale of assets, a merger or otherwise) or any division or Subsidiary of the Seller.  Neither Seller nor any Subsidiary thereof is a party to any litigation relating to such claims and, to the Knowledge of Seller, no such litigation is threatened.

SECTION III.17.     Product Warranty.  Except as set forth on Schedule 3.17, each product manufactured, sold, leased, or delivered by the Seller or a Subsidiary thereof in conducting the Business has been in conformity with all applicable contractual commitments and all express and implied warranties, and neither the Seller nor any Subsidiary thereof has any Liability for replacement or repair thereof or other damages in connection therewith, in excess of the warranty reserves reflected in the Financial Statements.  Schedule 3.17 sets forth the terms and conditions of Seller's warranties.

SECTION III.18.     Employees.  Schedule 3.18 contains a true, complete and accurate list of the names, annual compensation for the 2022 fiscal year and all bonuses and similar payments made for the 2022 fiscal year for all directors, officers, employees and consultants of the Business. Except as set forth on Schedule 3.18, within the past three (3) years neither the Seller nor any Subsidiary thereof is a party to or bound by any collective bargaining agreement, nor have they experienced any strikes, unresolved grievances, unresolved claims of unfair labor practices, or other unresolved collective bargaining disputes.  Except as set forth on Schedule 3.18, neither the Seller nor any Subsidiary thereof has, within the past three years, violated any obligations to any employee or any labor organization under any individual contract or any collective bargaining agreement or under any federal, state or local Laws relating to employee rights or employer duties, included but not limited to committing any unfair labor practice or any unlawful employment discrimination.  Seller has timely paid all wages, salaries, commissions and other compensation due to any of its employees, except as listed as unpaid on Schedule 3.18, and those which were delayed in payment due to the timing of the Bankruptcy Court Orders authorizing the payment of prepetition wages, and prepetition circumstances relating to Debtor's cash flow and the use of funds in its bank accounts.

Seller shall timely provide any and all notices which may be required under the Worker Adjustment and Retraining Notification Act of 1988, which notices may be made conditional upon closure and upon non-closure of the transaction contemplated by this agreement.

SECTION III.19.    Employee Benefits.

(a)    General.  Except as set forth on Schedule 3.19(a), neither the Seller nor any of its ERISA Affiliates is a party to, does not participate in and does not have any Liability with respect to any Employee Benefit Plan or any employment or consulting agreement.

(b)    Plan Documents and Reports.  A true and correct copy of each of the plans, programming policies, arrangements, and agreements listed on Schedule 3.19(a) (referred to hereinafter as "Benefit Plans"), and all Contracts relating thereto, or to the funding thereof, including, without limitation, all trust agreements, insurance Contracts, administration Contracts, investment management agreements, subscription and participation agreements, and recordkeeping agreements, each as in effect on the date hereof, has been supplied to the Buyer.  In the case of any Benefit Plan which is not in written form, the Buyer has been supplied with an accurate description of such Benefit Plan as in effect on the date hereof.  A true and correct copy of the most recent annual report, actuarial report, accountant's opinion of the plan's financial statements, summary plan description and Internal Revenue Service determination letter with respect to each Benefit Plan, to the extent applicable, and a current Schedule of assets (and the fair market value thereof assuming liquidation of any asset which is not readily tradable) held with respect to any funded Benefit Plan has been supplied to the Buyer, and there have been no material changes in the financial condition in the respective plans other than market gains or losses to date from that stated in the annual reports and actuarial reports supplied.

(a)        Compliance with Employee Benefit Laws; Liabilities.  Except as provided in Schedule 3.19(c):

(i)    To the Knowledge of Seller, all Benefit Plans comply and have been administered in form and in operation in all material respects with all applicable requirements of Law, and no event has occurred which will or could cause any such Employee Benefit Plan to fail to comply with such requirements and no notice has been issued by any governmental Authority questioning or challenging such compliance.

(ii)    Each Employee Pension Benefit Plan which is intended to be a qualified plan under Section 401(a) of the Code is the subject of a favorable current determination letter issued by the IRS with respect to the qualified status of such plan under Section 401(a) of the Code and the tax-exempt status of any trust which forms a part of such plan under Section 501(a) of the Code; all amendments to any such plan for which the remedial amendment period (within the meaning of Section 401(b) of the Code and applicable regulations) has expired are covered by a favorable current IRS determination letter; and no event has occurred which will or could give rise to disqualification of any such plan under such sections or to a tax under Section 511 of the Code.

(iii)    None of the assets of any Benefit Plan is invested in employer securities or employer real property.

(iv)     To the Knowledge of Seller, there have been no "prohibited transactions" (as described in Section 406 of ERISA or Section 4975 of the Code) with respect to any Benefit Plan and neither the Seller nor any of its ERISA Affiliates has engaged in any prohibited transaction.

(v)     To the Knowledge of Seller, there have been no acts or omissions which have given rise to or may give rise to fines, penalties, taxes or related charges under Section 502 of ERISA or Chapters 43, 47, 68 or 100 of the Code for which the Seller may be liable.

(vi)     There are no actions, suits or claims (other than routine claims for benefits) pending or, to the Knowledge of Seller, threatened involving any Benefit Plan or the assets thereof and, to the Knowledge of Seller, no facts exist which could give rise to any such actions, suits or claims (other than routine claims for benefits).

(vii)     There is no minimum funding deficiency under Section 302 of ERISA or Section 412 of the Code

(viii)     With respect to each Employee Pension Benefit Plan that is subject to Title IV of ERISA:

(A)     no steps have been taken to terminate any such plan;

(B)     there has been no withdrawal (within the meaning of Section 4063 of ERISA) of a "substantial employer" (as defined in Section 4001(a)(2) of ERISA);

(C)     no event or condition has occurred which would constitute grounds under Section 4042 of ERISA for the termination of or the appointment of a trustee to administer any such plan; and

(D)     all required contributions to such plan have been made as required by Section 302 of ERISA and Section 412 of the Code.

(ix)     Neither the Seller nor any of its ERISA Affiliates have any Liability or contingent Liability for providing, under any Benefit Plan or otherwise, any post-retirement medical or life insurance benefits, other than statutory Liability for providing group health plan continuation coverage under Part 6 of Title I of ERISA and Section 4980B of the Code.

(x)     There has been no act or omission by the Seller or any of its ERISA Affiliates that would impair the ability of the Seller (or any successor thereto) to unilaterally amend or terminate (in compliance with and subject to applicable Laws) any Seller Benefit Plan.

(b)     <u>Multiemployer Plans</u>.  The Seller does not contribute to, has not contributed to, and does not have any Liability or contingent Liability with respect to any Multiemployer Plan.

SECTION I.2.     <u>Environmental Matters</u>.  In connection with the conduct of the Business, except as set forth in <u>Schedule 3.20</u> of the Disclosure Schedule:

(a)     Each of Seller and its Subsidiaries are in compliance (and have been for the past three (3) years) with all Environmental Laws which compliance includes, but it is not limited to, the possession by Seller and its Subsidiaries of all Permits required under all applicable Environmental Laws, and compliance with the terms and conditions thereof.

(b)     Neither Seller nor any Subsidiary of Seller has received any written communication, whether from an Authority or Person, that alleges that Seller or any of its Subsidiaries is not in compliance with any Environmental Laws or Permits, which has not been resolved, and to the Knowledge of Seller, there are no conditions existing that could reasonably be expected to prevent or interfere with such full compliance in the future.

(c)     To the Knowledge of Seller, there are no past or present facts, circumstances or conditions, including the release of Hazardous Substances, that could reasonably be expected to result in a claim under Environmental Laws against Seller or any Subsidiary of Seller.

(d)     Seller has made available to Buyer prior to the execution of this Agreement all environmental audits, assessments and documentation in Seller's possession regarding environmental matters pertaining to, or the environmental condition of, the Purchased Assets or the compliance (or non-compliance) by Seller or any of its Subsidiaries with any Environmental Laws.

SECTION I.3.          Permits.  Schedule 3.21 is a true and accurate list of all licenses, certificates, permits, franchises, rights, code approvals (collectively, "Permits") held by the Seller or any Subsidiary thereof used in the conduct of the Business.  Except for the Permits listed on Schedule 3.21 of the Disclosure Schedule, there are no Permits, whether federal, state, local or foreign, which are necessary for the lawful operation of the Business of the Seller, including the Subsidiaries thereof, as such is presently conducted.

SECTION I.4.          Bank Accounts.  Schedule 3.22 sets forth the names and locations of each bank or other financial institution at which the Seller or any Subsidiary thereof has accounts (giving the account numbers) or safe deposit box and the names of all Persons authorized to draw thereon or have access thereto, and the names of all Persons, if any, now holding powers of attorney or comparable delegation of authority from the Seller and a summary statement thereof.

SECTION I.5.          Customers and Suppliers.  Schedule 3.23 sets forth:

(i)     A list of the Major Customers of the Seller and the Business, showing the total revenue received in the twelve (12) months prior to Closing; and

(ii)     A list of the Major Suppliers of the Seller and the Business and showing the approximate total purchases in the twelve (12) months prior to Closing.

SECTION I.6.          Improper and Other Payments.  To the Knowledge of the Seller:

(a)     Neither Seller, the Subsidiaries thereof, nor any director, officer, employee, agent or representative of the Seller, their respective Affiliates nor any Person acting on behalf of any of them, has made, paid or received any bribes, kickbacks or other similar payments to or from any Person, whether lawful or unlawful, relating to the Business;

(b)     no contributions have been made, directly or indirectly, to a domestic or foreign political party or candidate by any of the foregoing; and

19

(c)     no improper foreign payment (as defined in the Foreign Corrupt Practices Act) has been made by any of the foregoing.

SECTION I.7.     <u>Brokers</u>.  Neither Seller, any officer, member, director or employee of Seller, nor any Affiliate of Seller has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

SECTION 3.26.  <u>Billing</u>.  <u>Schedule 3.26</u> sets forth all Targeted Probe and Educate ("TPE") results of review for the past three (3) years.


ARTICLE II

REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to Seller that the statements contained in this <u>Article IV</u> are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this <u>Article IV</u>).

SECTION II.1.     <u>Organization of the Buyer</u>.  The Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware and under the Laws of each jurisdiction in which it is required to be so qualified except where the failure to be so qualified would not have a Material Adverse Effect on the Buyer.  The Buyer is not in default under or in violation of any provision of its articles of incorporation or bylaws.

SECTION II.2.     <u>Authorization of Transaction; Consents</u>.  The Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and the other Transaction Agreements and to perform its obligations hereunder and thereunder.  This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions, subject to issuance of the Sale Order and approval of the Bankruptcy Court.  The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

SECTION II.3.     <u>Noncontravention</u>.    Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, Law, settlement agreement regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its charter or bylaws or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or consent under any agreement, Contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject.

SECTION II.4.       Brokers.   Neither Buyer, any officer, member, director or employee of Buyer, nor any Affiliate of Buyer has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

SECTION II.5.       Sufficient Funds.   Buyer has, and on the Closing Date will have, sufficient funds to pay the Purchase Price and satisfy its other obligations under this Agreement.   If so requested by Seller, Buyer shall deliver to Seller reasonably satisfactory evidence establishing its compliance with this Section 4.5.

ARTICLE III

COVENANTS

SECTION III.1.       General.   Each of the parties will use his or its reasonable best efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction of the closing conditions set forth in Articles VII and VIII), subject to Seller's fiduciary duties as a debtor-in-possession under the Bankruptcy Code.

SECTION III.2.       Notices and Consents.   The Seller will give any notices to third parties, and will use commercially reasonable efforts to obtain any third party consents necessary to consummate the transactions contemplated hereby, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order.   Each of the parties will give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters referred to in Section 3.4 and Section 4.3 above, in each case as necessary to the extent such authorizations, consents and approvals are not provided for or satisfied by the Sale Order.

SECTION III.3.       Operation of Business.

(a)       Ordinary Course.   Except as otherwise provided in this Agreement, from the date of this Agreement until the Closing Date, the Business shall be operated in the Ordinary Course of Business and Seller shall use commercially reasonable efforts to preserve intact the present business organization of the Business (other than as permitted by Section 5.3(b)), preserve the business relationships of the Seller with other Persons material to the operation of the Seller. Without limiting the generality of the foregoing, except as set forth in Schedule 5.3 or as contemplated by this Agreement or as ordered by the Bankruptcy Court, prior to the Closing, the Seller will not, and will not permit any Subsidiary thereof to, without the prior written consent of the Buyer: (i) enter into any contract, agreement or transaction other than in the Ordinary Course of Business and consistent with past practice and other than in accordance with this Agreement; (ii) sell or otherwise dispose of any assets or inventory of the Seller or such Subsidiary other than in the Ordinary Course of Business and consistent with past practice; (iii) waive, release or cancel any claims against third parties or debts owing to it, or any rights which have any value involving more than $25,000 and outside of the Ordinary Course of Business; (iv) make any changes in its accounting systems, policies, principles or practices; (v) other than in the Ordinary Course of Business, enter into, authorize, or permit any transaction with or any Affiliate of Seller, or enter

21

into any Contract relating to compensation or benefits with any Person, or, modify any compensation amounts or levels of any officer or employee (other than as permitted by Section 5.3(b)); (vi) make any loans, advances (other than expense advances in the Ordinary Course of Business) or capital contributions to, or investments in, any other Person; (vii) amend any employment agreements, trusts, plans, funds or other arrangements for the benefit or welfare of any current or former director, manager, officer or employee, or increase in any manner the fringe benefits of any current or former director, manager, officer or employee or pay any benefit not required by any existing plan and arrangement or enter into any Contract, agreement, commitment or arrangement to do any of the foregoing; (viii) acquire, lease, encumber or otherwise impose a Lien on any Purchased Assets or assets of the Seller, whether tangible or intangible other than Liens imposed pursuant to Seller's current debt facilities; or (ix) terminate, modify, amend or otherwise alter or change any of the terms or provisions of any agreement with a Major Customer or, other than in the Ordinary Course of Business, any other agreement.

(b)      Employees and Benefit Plans.  No later than the Closing Date, Seller shall (i) take all actions necessary to terminate the employment of all of its employees whose continued employment is not essential to any "winding down" activities or operations of Seller which will continue beyond the Closing Date; (ii) Seller shall terminate all Seller Benefit Plans; however, with regard to any Employee Pension Benefit Plan that is subject to Title IV of ERISA, Seller shall adopt Board resolutions to terminate the Employee Pension Benefit Plan before the Closing Date but the actual termination date may be later than the Closing Date; and (iii) Seller shall pay all postpetition wages, salaries, commissions and other compensation due to any of its employees as of termination of employment subject to any applicable cash collateral or postpetition financing agreements and budgetary constraints.  Subsequent to the Closing Date, Seller shall obtain a favorable IRS determination letter with respect to the termination of each Employee Pension Benefit Plan and related trust that is terminated pursuant to clause (ii) above in this subsection (b) and is, or was at any time, intended to satisfy the requirements for tax-qualification under Sections 401(a) and 501(a) of the Code, except that a favorable IRS determination letter is not required if the Employee Pension Benefit Plan is subject to Title IV of ERISA and terminates in a "distress" termination under regulations published by the Pension Benefit Guaranty Corporation.

(c)      Cash Proceeds.  Through the Closing Date, Seller shall have access to the cash proceeds generated as a result of collecting its receivables, subject to the terms of the cash collateral agreement with Seller's pre-petition secured lenders, the terms and conditions of such cash collateral agreement to be reasonably satisfactory to Buyer.

(d)      Baseline Environmental Assessment.  As soon as reasonably possible, Seller shall undertake a Baseline Environmental Assessment ("BEA"), with respect to its facility located in Waterford, Michigan, for the benefit of, addressed to and in the name of, the Buyer.  Buyer will reimburse Seller for the expense of the BEA.

SECTION III.4.      Bankruptcy Actions.

(a)      Seller shall use best efforts to procure the entry of the Sale Order and supporting papers, in form and substance satisfactory to Buyer and attached hereto as Exhibit C and to not have such Sale Order stayed prior to Closing.

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

(b)      If required, as promptly as practicable, Seller will provide Buyer with copies of all motions, applications, and supporting papers prepared by Seller in connection with this Agreement (including forms of Orders and notices to interested parties) for Buyer's review.

(c)      Seller shall immediately notify Buyer of any order of the Bankruptcy Court entered in the Chapter 11 Case that affects or will affect the operation of the Business or the Purchased Assets and promptly deliver a copy of any such order to Buyer.

SECTION III.5.      Adequate Assurance Data.  Buyer agrees that it shall use commercially reasonably efforts to deliver to Seller written evidence of its ability to provide adequate assurance of future performance in accordance with Section 365(f)(B) of the Bankruptcy Code in the event of an objection on such grounds by any Person that is party to an Assumed Contract.  In addition, Buyer agrees to cooperate with reasonable requests for additional evidence thereof that are made by any Person who is a party to any Assumed Contract.

SECTION III.6.      Full Access.  From and after the date hereof, Seller will permit and cause the Subsidiaries to permit, representatives of the Buyer to have full access to all premises, properties, personnel, books, records (including Tax records), Contracts, and documents of or pertaining to the Seller, any Subsidiaries thereof or the Business and shall make the officers and employees of the Seller, and Subsidiaries thereof available to the Buyer and its representatives as the Buyer and their representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate the Seller to take any actions that would disrupt the normal course of its business or violate the terms of any agreement to which the Seller and the Business is bound or any applicable Law or regulation.  From and after the date hereof, Seller shall provide such access to Buyer and its representatives as may be necessary for Buyer to conduct any environmental due diligence and such testing and investigation as may be necessary to prepare a Baseline Environmental Assessment (as defined pursuant to the laws of the State of Michigan) or similar assessment at any property owned, leased or used by Seller wherever located.

SECTION III.7.      Maintenance of Insurance.  Seller will continue to carry its existing insurance pertaining to the Business, including its existing insurance on the Purchased Assets through the Closing Date, subject to any cash collateral or debtor in possession Orders and budgetary constraints and shall not allow any material breach, default or cancellation (other than expiration and replacement of policies in the Ordinary Course of Business) of such insurance policies or agreements to occur or exist.

SECTION III.8.      Notice and Supplemental Information.  Seller and the Buyer shall give prompt notice to the other parties of any material adverse development causing a breach of any of its own representations and warranties in Articles III and IV respectively.  In addition, Seller will (i) immediately notify Buyer in writing of any development that would have a Material Adverse Effect on the Business, including without limitation, any loss of the Purchased Assets, and (ii) by notice in accordance with the terms of this Agreement, supplement or amend the Schedules, including one or more supplements or amendments to correct any matter which would constitute a breach of any representation, warranty, agreement or covenant contained herein.

SECTION III.9.      Transition.  Other than the filing of the Chapter 11 Case and actions incident thereto, Seller will not, without previously consulting Buyer, take any action that is designed or

intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of the Business from maintaining the same business relationships with the Business after the Closing as it maintained with the Business prior to the Closing, if such action would have a Material Adverse Effect.  Seller will refer all customer inquiries relating to the Business to the Buyer from and after the Closing.

SECTION III.10.        Confidentiality.  Seller will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and, in the event of a Closing, deliver promptly to the Buyer or destroy, at the request and option of the Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in their possession other than Confidential Information solely related to Excluded Assets. In the event that Seller or any Subsidiary thereof is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller will notify the Buyer promptly of the request or requirement so that the Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.10.  If, in the absence of a protective order or the receipt of a waiver hereunder, a party is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, Seller or such Subsidiary may disclose the Confidential Information to the tribunal; provided, however, that Seller or such Subsidiary shall use its best efforts to obtain, at the request of the Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Buyer shall designate.

SECTION III.11.        [intentionally deleted].

SECTION III.12.        Major Customers and Suppliers.  Except as set forth on Schedule 5.12, since January 1, 2023, Seller has not received written or, to the Knowledge of Seller, oral notice that any Major Customer or Major Supplier intends to, or has threatened to, terminate, cancel, or materially and adversely modify its Contracts or relationship with Seller. Since January 1, 2023, no Major Customer or Major Supplier has threatened in writing or, to the Knowledge of Seller, orally to materially and adversely alter the amount of business that it is presently doing with Seller, nor has any Major Customer or Major Supplier alleged in writing or, to the Knowledge of Seller, orally that Seller has breached or defaulted under any applicable Contract.

SECTION III.13.        Post-Closing Covenants.  Seller and the Buyer agree as follows with respect to the period following the Closing:

(a)        In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as any other party hereto reasonably may request, all at the sole cost and expense of the requesting party.

(b)        In the event and for so long as any party hereto actively is contesting or defending against any charge, complaint, action, suit, proceeding, hearing, investigation, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Business, each of the other

parties hereto will cooperate with him or it and his or its counsel in the contest or defense, make available their personnel, and provide such testimony and access to their books and records as shall be reasonably necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party.

(c)     Following the Closing, the Buyer shall give to the Seller, without charge, reasonable access upon reasonable notice and during business hours to (and the right to make copies at the expense of the Seller of) the books, files and records of the Seller, the Subsidiaries thereof and the Business to the extent that such relate to the business and operations of the Business on or prior to the Closing Date and are in the Buyer's possession on the Closing Date or subsequently come into the Buyer's possession, but any access pursuant to this <u>Section 5.13(c)</u> shall be conducted by the Seller in good faith, with a reasonable purpose and in such manner as not to interfere unreasonably with the operations of the Buyer following the Closing.  For a period of six (6) years after the closing, the Buyer shall maintain such books, files and records tax returns and thereafter, prior to destroying or disposing of any of them, the Buyer shall give, or shall cause the Business to give thirty (30) days' advance notice to the Seller of their intended destruction or disposition, and during such thirty (30) day period the Seller shall have the right to take possession of the same or to make copies of the same, all at the Seller's expense.  Notwithstanding the foregoing, in the event there is a conflict between the provisions of this <u>Section 5.13(c)</u> and those of <u>Section 10.3</u> and <u>Section 10.4</u>, then <u>Section 10.3</u> and <u>Section 10.4</u> shall control.

(d)     Buyer shall reserve the right to require that, subject to Bankruptcy Court approval, for a period of forty-five (45) days after the Closing, the trustee appointed by the Bankruptcy Court (or if no trustee has been appointed, the Seller) shall assume and assign to Buyer any additional contracts of Seller or a Subsidiary thereof identified by Buyer that are necessary for or used and useful in the Business.

(e)     Buyer shall reserve the right to credit bid to the extent that Buyer completes the purchase of the Comerica credit position prior to the Closing. Following the Closing, the Seller shall enter into a management agreement to the extent necessary to allow the Business to continue operations for a period until the Certification for Clinical Laboratory ("<u>CLIA</u>") operating license is transferred to Buyer or Buyer is granted a new CLIA operating license.


## ARTICLE IV

## OVERBID PROCEDURES

SECTION IV.1.     <u>Overbid Procedures</u>.    This Agreement and the enforceability of the provisions hereof are subject to Bankruptcy Court approval.  Promptly, but in no event later than three (3) Business Days following the full execution and delivery of this Agreement, Seller shall file with the Bankruptcy Court a motion which may be part of the Sale Motion (in form and substance reasonably satisfactory to Buyer, the "<u>Sale Motion</u>"), notices and proposed orders, each in form and substance satisfactory to Buyer, seeking the Bankruptcy Court's issuance of:

(a)     an Order in the form of <u>Exhibit E</u> hereto (the "<u>Sale Procedures Order</u>") which shall include, without limitation:

(i)      a Topping Offer threshold of $200,000 for any initial competing bid, and any incremental competing bids of $200,000 thereafter;

(ii)      a requirement that qualified bidders make a refundable deposit of $200,000 in order to enter the bidding;

(iii)      reimbursement of all of Buyer's out-of-pocket costs and expenses incurred in connection with the transactions contemplated hereby including without limitation legal fees not to exceed $250,000 which shall be paid to Buyer if the Buyer is not the successful bidder for the Purchased Assets;

(iv)      a requirement that any Topping Offer be substantially similar to this Agreement in all material respects;

(v)      such other bidding procedures for the Auction as shall be required by the Buyer.

(b)      an Order, in form of Exhibit C hereto, approving this agreement and granting related relief.

A Third Party interested in acquiring the assets of the Business may submit to Seller an Acquisition Proposal in compliance with the provisions of Exhibit E.

## ARTICLE V

## CONDITIONS TO OBLIGATION OF BUYER

The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

SECTION V.1.      Representations and Warranties True as of Closing Date.      The representations and warranties set forth in Article III shall have been accurate, true and correct in all material respects on and as of the date of this Agreement, and shall also be accurate, true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

SECTION V.2.      Compliance by Seller; Consents.  Seller shall have performed and complied with all of the covenants, agreements and conditions contained herein in all material respects on or prior to the Closing.   All material consents, approvals, waivers and permits from third parties and governmental and regulatory authorities required to consummate the transactions set forth herein, if any, shall have been obtained.  Failure to obtain any required consent with respect to any Assumed Contract shall not entitle Buyer to terminate this Agreement or to decline to purchase the Purchased Assets if (i) such failure is due to Buyer's inability to satisfy commercially reasonable conditions customarily imposed by the licensor or other counter-party under any such Assumed Contract, (ii) if such failure would not cause a Material Adverse Effect on the Business or the Purchased Assets, or (iii) if such failure results from the Bankruptcy Court not approving the assumption of such Assumed Contract because of Buyer's failure to give adequate assurance of future performance pursuant to this Agreement.

SECTION V.3.        Sale Order.  The sale hearing providing for the approval of the Sale Order (the "Sale Hearing") substantially in the form attached hereto as Exhibit C, shall occur on or before August 3, 2023, the Sale Order shall have been entered on or before August 7, 2023, and the closing of the transactions contemplated hereby shall occur on August 10, 2023, provided that the Sale Order has not been stayed.

SECTION V.4.        No Injunction; Material Adverse Effect.   No action, proceeding, investigation, regulation, or legislation shall be pending or threatened which seeks to enjoin, restrain, or prohibit Buyer, or to obtain substantial damages from Buyer, in respect of the consummation of the transactions contemplated hereby, or which seeks to enjoin the operation of all or a material portion of the Business which, in the reasonable judgment of Buyer, would make it inadvisable to consummate the transactions contemplated by this Agreement.  There shall have been no Material Adverse Effect on the Business.

SECTION V.5.        Bankruptcy Filing.  Buyer shall be satisfied, in its sole discretion, that Seller shall have filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code, the Auction shall have occurred and Buyer shall be entitled to purchase the Purchased Assets pursuant to this Agreement, and all Purchased Assets will be transferred to Buyer free and clear of all liens, claims, interests, indebtedness and restrictions on transfer under Section 363(f) of the Bankruptcy Code.

SECTION V.6.        [intentionally deleted].

SECTION V.7.        FIRPTA Certificate.  The Buyer shall have received from the Seller and any other Seller that is a "United States person" within the meaning of Section 7701(a)(30) of the Code a duly executed certificate in the form specified by Treasury Regulation § 1.1445-2(b)(2).

SECTION V.8.        Purchased Assets.   There shall have been no damage to the Purchased Assets by fire, flood, casualty, act of God or public enemy or other cause, or condemnation or public taking of the Purchased Assets, of value greater than $300,000, regardless of insurance coverage for such damage.

SECTION V.9.        Documents.   All actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to the Buyer.  Seller shall deliver to Buyer an opinion of Seller's counsel, addressed to Buyer, reasonably satisfactory to Buyer.

SECTION V.10.        Transaction Documents.   Seller and Buyer shall have entered into the Transaction Documents.

SECTION V.11.        Release of Liens.  Seller shall have caused all Liens on the Purchased Assets to be discharged and extinguished and Buyer shall be satisfied that all Liens have been discharged and extinguished in connection with the Chapter 11 case.

SECTION V.12.        Leases.  Seller shall assume and assign to Buyer the lease for Seller's facility and shall deliver a lease, in the form of Exhibit D attached hereto or as otherwise reasonably acceptable to Buyer, of the real estate located in Waterford, Michigan for a minimum period of

twelve months with two three month renewal options, for an annual rent of not greater than $378,756.63 per annum.

SECTION V.13.    Cure Payments.  Buyer shall make available from the Purchase Price, in cash, to make, cure payments on all executory contracts which Buyer requires Seller to assign and Buyer to assume.  To the Knowledge of Seller, all such cure payments as of the date of this Agreement are set forth on Schedule 7.13.

SECTION V.14.    Benefit Plans.  Seller shall have terminated all Seller Benefit Plans to the extent provided in Section 5.3(b) hereof.

SECTION V.15.    Environmental.  Buyer shall have been provided with a completed Baseline Environmental Assessment (as defined pursuant to the laws of the State of Michigan) or a similar assessment for all of Seller's properties leased or owned in Michigan.

SECTION V.16.    Termination of Seller's Employees.  On or before the Closing Date, Seller will terminate the employment of each employee, other than those employees required to "wind-down" the affairs of Seller after the Closing.  Seller shall be solely responsible for terminating its employees as provided in Section 5.3(b) of this Agreement.  Seller shall provide any notice of termination required by Law, including, but not limited to, the Worker Adjustment and Retraining Modification Act of 1988, or any contract between Seller and any Person, including, but not limited to, any collective bargaining agreement.  Buyer shall have no obligation to hire any of Seller's former employees.

## ARTICLE VI

## CONDITIONS TO OBLIGATION OF SELLER

The obligation of Seller to consummate the transactions to be performed by Seller in connection with the Closing is subject to satisfaction of the following conditions:

SECTION VI.1.    Representations and Warranties True as of Closing.  The representations and warranties set forth in Article IV shall have been accurate, true and correct on and as of the date of this Agreement, and shall also be accurate, true and correct on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date.

SECTION VI.2.    Compliance with Covenants.  The Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

SECTION VI.3.    Actions or Proceedings.  No action, suit, or proceeding shall be pending before any court or quasijudicial or administrative agency of any federal, state, local, or foreign jurisdiction wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect).

SECTION VI.4.    [intentionally deleted].

SECTION VI.5.     Documents.  All actions to be taken by the Buyer in connection with the consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Seller.

SECTION VI.6.     Transaction Documents.  Sellers and the Buyer shall have entered into the Transaction Documents.

SECTION VI.7.     Sale Order.  The Sale Order shall have been entered in substantially the form attached as Exhibit C and shall not be subject to stay.

SECTION 8.8.  Employee Leasing Agreement. The Seller and Buyer shall have entered into  a lease agreement for the employees of the Business.

SECTION 8.9  Management Services Agreement. The Seller and Buyer shall have entered into a management services agreement.

ARTICLE VII

SURVIVAL

SECTION VII.1.     Survival of Representations and Warranties.  All of the warranties and representations contained herein or in any Transaction Documents or closing document contemplated hereby or thereby shall terminate on the Closing Date.

ARTICLE VIII

TAX MATTERS

SECTION VIII.1.     Tax Matters.  The following provisions shall govern the allocation of responsibility as between Buyer and Seller for certain tax matters following the Closing Date:

SECTION VIII.2.     Proration of Taxes.  Except to the extent otherwise provided in Section 1146(C) of the Bankruptcy Code, liability for all real property taxes, personal property taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (the "Apportioned Obligations") shall be apportioned between the Seller and the Buyer based on the number of days of such taxable period included in the period ending on the Closing Date (the "Pre-Closing Tax Period") and the number of days of such taxable period included in the period after the Pre-Closing Tax Period (the "Post-Closing Tax Period").  The Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period.  The Buyer shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period.

SECTION VIII.3.     Tax Periods Beginning Before and Ending After the Closing Date.  The Buyer shall prepare or cause to be prepared and file or cause to be filed any Tax Returns relating to the Purchased Assets for Tax periods which begin before the Closing Date and end after the Closing Date.  The Buyer shall permit the Seller to review and comment on each such Tax Return

described in the preceding sentence prior to filing for no more than five (5) business days. The Buyer and the Seller shall attempt in good faith to resolve any disagreements regarding such Tax Returns; provided, however, that the final decision regarding any such Tax Return shall rest with the Buyer. The Seller shall pay to the Buyer within fifteen (15) days after the date on which Taxes are paid with respect to such periods an amount equal to the portion of such Taxes that is attributable to the Pre-Closing Tax Period. The Buyer shall pay to the Seller the amount, if any, by which Taxes prepaid by the Seller exceeds the portion of such Taxes that is attributable to the Pre-Closing Tax Period.

SECTION VIII.4.    Allocation of Purchase Price to Purchased Assets Transferred on or after the Closing Date. The Buyer and the Seller agree to allocate the Purchase Price (including the amount of all capitalizable costs) among the Purchased Assets for all purposes (including financial accounting and tax purposes) in accordance with the allocation Schedule attached as Schedule 10.4, which allocation shall be prepared by the Buyer within ninety (90) days after the Closing Date. The Buyer and the Seller, in connection with their respective U.S. federal, state and local Tax Returns and other filings (including without limitation Internal Revenue Service Form 8594), shall not take any position inconsistent with such treatment and allocation. Any adjustment to the Purchase Price shall be allocated as provided in Treas. Regulation § 1.1060-1(c).

SECTION VIII.5.    Cooperation on Tax Matters.

(a)    The Buyer and the Seller shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and the application for Tax refunds and credits pursuant to this Article X and any audit, litigation or other proceeding with respect to Taxes relating to the Purchased Assets. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information relating to the Purchased Assets which are reasonably relevant to any such audit, litigation or other proceeding relating to the Purchased Assets and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Seller agrees (A) to retain all books and records with respect to Tax matters pertinent to the Purchased Assets relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Buyer, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing Authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, the Seller or Buyer, as the case may be, shall allow the other party to take possession of such books and records.

(b)    The Buyer and the Seller further agree, upon request, to use their reasonable efforts to obtain any certificate or other document from any governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax relating to the Purchased Assets that could be imposed (including, but not limited to, with respect to the transactions contemplated hereby).

SECTION VIII.6.    Certain Taxes. All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement, shall be paid by the Seller when due, and the Seller will, at  its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary,

30

sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, Buyer will, and will cause its affiliates to, join in the execution of any such Tax Returns and other documentation.

## ARTICLE IX

## TERMINATION

SECTION IX.1.    <u>Termination of Agreement</u>.    Certain of the parties may terminate this Agreement as provided below:

(a)    the Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)    the Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing in the event (i) Seller has breached any representation, warranty, or covenant contained in this Agreement in any material respect and such breach remains uncured for a period of ten (10) days after receipt of such notice, or (ii) the Closing shall not have occurred on or before August 15, 2023;

(c)    the Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing in the event Buyer has breached any representation or warranty contained in this Agreement in any material respect and such breach remains uncured for a period of ten (10) days after receipt of such notice, or if the Closing shall not have occurred on or before December 31, 2023 due to an uncured breach of this Agreement by Buyer;

(d)    [reserved];

(e)    the Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing in the event Seller's Chapter 11 is converted to a case under Chapter 7 of the Bankruptcy Code; and

(f)    the Seller may terminate this Agreement by giving written notice to Buyer in the event (x) all conditions to the obligation of Buyer to consummate the transactions contemplated hereby and set forth in this Agreement, including without limitation those conditions set forth in Article VII hereof, have been satisfied by Seller and (y) Buyer does not consummate such transactions within five (5) business days of such date.

(g)    the Buyer (or Seller, provided it pays the amounts due Buyer pursuant to <u>Section 12.1</u>) may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing in the event a qualified Acquisition Proposal (as provided in the Sale Procedures Order) has been timely submitted and Buyer (x) has not delivered a Topping Offer to Seller at any time prior to the deadline set forth in the Sale Procedures Order or (y) has delivered a Topping Offer to Seller at any time prior to the deadline set forth in the sale Procedures Order which Seller, in either case, has determined, in its sole and absolute discretion, not to be equal to or better than all Acquisition Proposals.

SECTION IX.2.    <u>Effect of Termination</u>.    If any party terminates this Agreement pursuant to <u>Section 11.1</u> above, all rights and obligations of the parties hereunder shall terminate other than

those set forth in <u>Sections 5.10</u> (Confidentiality) and <u>12.1</u> (Expenses), without any Liability of any party to any other party (except for any Liability of any party then in breach).

<div align="center">ARTICLE X</div>

<div align="center">MISCELLANEOUS</div>

SECTION X.1.      <u>Expenses</u>.  Except as otherwise provided herein, each party will bear his or its own costs and expenses (including legal fees and expenses or expenses of other representatives and consultants) incurred in connection with this Agreement and the transactions contemplated hereby (whether consummated or not) other than as specifically set forth herein.  Seller shall pay all transfer taxes arising as a result of the transactions contemplated hereby.

SECTION X.2.      <u>Press Releases and Public Announcements</u>.  No party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the Buyer; <u>provided</u>, <u>however</u>, that any party may make any public disclosure it believes in good faith is required by applicable Law or any listing or trading agreement concerning its publicly traded        securities (in which case the disclosing party will use its best efforts to advise the other parties prior to making the disclosure).

SECTION X.3.      <u>No Third-Party Beneficiaries</u>.  Subject to the provisions of <u>Section 12.5</u>, this Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

SECTION X.4.      <u>Entire Agreement</u>.  This Agreement (including the Sale Order and all documents attached hereto) constitutes the entire agreement among the parties and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof.

SECTION X.5.      <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.  No party may assign either this Agreement or any of his or its rights, interests, or obligations hereunder without the prior written approval of the Buyer and Seller; <u>provided</u>, <u>however</u>, that the Buyer may, upon prior written notice but without the consent of the Seller,  (i) grant a security interest in respect of its rights hereunder to its lenders and (ii) transfer and assign this Agreement and its rights and obligations hereunder to a newly created corporation or other business entity, under the control of, or under common control with, Buyer.  No such transfer or assignment shall relieve Alexander Enterprises, Inc. of its obligations hereunder.

SECTION X.6.      <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts and by facsimile, each counterpart of which shall be deemed an original but all of which together will constitute one and the same instrument.

SECTION X.7.      <u>Headings</u>.  The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

<div align="center">32</div>

SECTION X.8.      Notices.  All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given or received (i) when delivered if delivery personally (including by courier); (ii) two business days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (iii) on the day after mailing if sent by a nationally-recognized overnight delivery service which maintains records of the time, place and recipient of delivery, and in each case addressed to the intended recipient as set forth below:

(a)      If to Buyer, addressed as follows:

Auxo Investment Partners, LLC
38 Commerce Ave SW
Grand Rapids, Michigan 49503
Attention: Jeff Helminski
jhelminski@auxopartners.com
Phone: (616) 980-9811

with a copy to:

Miller, Johnson, Snell & Cummiskey, PLC
250 Monroe Ave., N.W.
Suite 800
Grand Rapids, Michigan 49503-2250
Attention:  Bob Wolford
wolfordr@millerjohnson.com
Phone:  (616) 831-1726

and

(b)      If to the Seller, addressed as follows:

Robert Bassel via email only bbassel@gmail.com


Any party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth.

SECTION X.9.      Governing Law.  This Agreement shall be governed by and construed in accordance with the domestic Laws of the State of Michigan without giving effect to any choice or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of Michigan.

SECTION X.10.     Amendments and Waivers.     No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and Seller. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

SECTION X.11.     Severability.     Except for any instance which would otherwise violate the Sale Order, any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

SECTION X.12.     Construction.     The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

SECTION X.13.     Incorporation of Exhibits and Schedules.     The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

SECTION X.14.     Submission to Jurisdiction.     Each of the parties submits to the jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court; provided, however, if the Bankruptcy Court refuses to accept jurisdiction, then any state or federal court located in Michigan shall have jurisdiction.  Each party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.  Any party may make service on any other party by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 12.8 above. Nothing in this Section 12.14, however, shall affect the right of any party to bring any action or proceeding arising out of or relating to this Agreement in any other court or to serve legal process in any other manner permitted by law or at equity. Each party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

SECTION X.15.     Backup Bid.     If Buyer submits the Backup Bid (as defined in an Exhibit to the Sale Order), Buyer shall keep its offer open under this Agreement for thirty (30) days after June 30, 2023, so long as a Closing with Buyer occurs within such 30-day period.  This Section 12.15 shall survive the termination of this Agreement.

SECTION X.16.     Jury Trial Waiver.     To the maximum extent permitted by Law, Buyer and Seller waive their respective rights, if any, to a jury trial of any claim, controversy, dispute or cause

34

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

of action directly or indirectly based upon or arising out of this Agreement or any of the transactions contemplated by this Agreement, including contract claims, tort claims, breach of duty claims, and all other common law or statutory claims. Buyer and Seller represent that each has reviewed this waiver and each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

AUXO INVESTMENT PARTNERS, LLC

By:_____*Brian Dora*_____

Name:  Brian Dora
Title: Principal


ARK LABORATORY, LLC


By:_____*James Grossi*_____

Name: James Grossi, subject to Bankruptcy Court approval and attachment of agreed Schedules and Exhibits
Title:

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

<u>EXHIBIT A</u>

<u>Form of Assignment and Assumption Agreement</u>

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

EXHIBIT B

Form of Bill of Sale

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

EXHIBIT C

Form of Sale Order

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

EXHIBIT D

Lease

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

<u>EXHIBIT E</u>

<u>Sale Procedures Order</u>

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

<u>SCHEDULE A</u>

<u>Excluded Assets</u>

# None

## SCHEDULE B

Purchased Assets

# All assets owned by Debtor, including, but not limited to, the attached:

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property     12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:**     **Cash and cash equivalents**

1. **Does the debtor have any cash or cash equivalents?**

    ☐ No. Go to Part 2.
    ■ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | Current value of debtor's interest |
|---|---|---|---|

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | **Comerica** | **checking** | **5687** | **$100,272.30** |
| 3.2. | **Huntington** | **cnecking** | **7845** | **$755.00** |
| 3.3. | **Comerica, gets swept to other Comerica account daily** | **checking** | **5695** | **$0.00** |

4.     **Other cash equivalents** *(Identify all)*

5.     **Total of Part 1.**
       Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.     | **$101,027.30** |

**Part 2:**     **Deposits and Prepayments**

6. **Does the debtor have any deposits or prepayments?**

    ☐ No. Go to Part 3.
    ■ Yes Fill in the information below.

7.     **Deposits, including security deposits and utility deposits**
       Description, including name of holder of deposit

8.     **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

| | | |
|---|---|---|
| 8.1. | **Newbsknob, 2 months prepaid** | **$5,750.00** |

9. **Total of Part 2.**
   Add lines 7 through 8. Copy the total to line 81.        **$5,750.00**

**Part 3:**    **Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.
■ Yes Fill in the information below.

11. **Accounts receivable**

| 11a. 90 days old or less: | **6,901,899.76** | - | **3,582,142.30** | = ... | **$3,319,757.46** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

| 11b. Over 90 days old: | **10,178,570.27** | - | **6,007,510.84** | =... | **$4,171,059.43** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

12. **Total of Part 3.**
    Current value on lines 11a + 11b = line 12. Copy the total to line 82.        **$7,490,816.89**

**Part 4:**    **Investments**

13. **Does the debtor own any investments?**

■ No. Go to Part 5.
☐ Yes Fill in the information below.

**Part 5:**    **Inventory, excluding agriculture assets**

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.
■ Yes Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | | | | |
| 20. **Work in progress** | | | | |
| 21. **Finished goods, including goods held for resale** | | | | |
| 22. **Other inventory or supplies consumable supplies used in testing** | **4/7/2023** | **$581,697.89** | | **$581,697.89** |

23. **Total of Part 5.**
    Add lines 19 through 22. Copy the total to line 84.        **$581,697.89**

24. **Is any of the property listed in Part 5 perishable?**

■ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☐ No
■ Yes. Book value     10,388.08   Valuation method    cost    Current Value    10,388.08

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
■ No
☐ Yes

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---|---|

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No. Go to Part 7.
☐ Yes Fill in the information below.

| Part 7: | Office furniture, fixtures, and equipment; and collectibles |
|---|---|

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | | | |
| 40. **Office fixtures**<br>office fixtures | $54,872.03 | Book Value/Stra | $54,872.03 |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software**<br>office equipment | $6,619.79 | Book Value/Stra | $6,619.79 |
| 42. **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |

43. **Total of Part 7.**
Add lines 39 through 42. Copy the total to line 86.
     $61,491.82

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
■ No
☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
■ No
☐ Yes

| Part 8: | Machinery, equipment, and vehicles |
|---|---|

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
■ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| **47.** **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| **48.** **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| **49.** **Aircraft and accessories** | | | |
| **50.** **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**<br>other machinery | $2,375,750.53 | Book value Strai | $2,375,750.53 |

**51.** **Total of Part 8.**

Add lines 47 through 50.  Copy the total to line 87.

$2,375,750.53

**52.** **Is a depreciation schedule available for any of the property listed in Part 8?**

■ No

☐ Yes

**53.** **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

■ No

☐ Yes

**Part 9:**    **Real property**

**54. Does the debtor own or lease any real property?**

☐ No.  Go to Part 10.

■ Yes Fill in the information below.

**55.**    **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of<br>property<br>Include street address or other<br>description such as Assessor<br>Parcel Number (APN), and type<br>of property (for example,<br>acreage, factory, warehouse,<br>apartment or office building, if<br>available. | Nature and<br>extent of<br>debtor's interest<br>in property | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| **55.1.**   **6620 Highland Road, leasehold improvements** | | $479,656.87 | | $479,656.87 |

**56.**    **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

$479,656.87

**57.**    **Is a depreciation schedule available for any of the property listed in Part 9?**

■ No

☐ Yes

**58.**    **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

■ No

☐ Yes

## Part 10:   Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.
■ Yes Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60.   **Patents, copyrights, trademarks, and trade secrets** | | | |
| 61.   **Internet domain names and websites** | | | |
| 62.   **Licenses, franchises, and royalties** | | | |
| 63.   **Customer lists, mailing lists, or other compilations** | | | |
| 64.   **Other intangibles, or intellectual property** | | | |
| 65.   **Goodwill** good will, intellectual property, etc. | | | **Unknown** |

66.   **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

unknown

67.   **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107**?**
■ No
☐ Yes

68.   **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
■ No
☐ Yes

69.   **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
■ No
☐ Yes

## Part 11:   All other assets

**70. Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

■ No. Go to Part 12.
☐ Yes Fill in the information below.

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $101,027.30 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $5,750.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $7,490,816.89 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $581,697.89 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $61,491.82 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $2,375,750.53 | |
| 88. **Real property.** *Copy line 56, Part 9*.................................................> | | $479,656.87 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | unknown | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $10,616,534.43 | + 91b. $479,656.87 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $11,096,191.30 |

DocuSign Envelope ID: 7A32E6DA-2666-4B33-9382-58A5581A54DB

## SCHEDULE C

## Assumed Contracts

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining (in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| Abbott Laboratories INC., D-943, CP1-4<br>100 Abbott Park Road<br>Abbott Park, Illinois 60064-6095 | IMS Software - Ordering System for Reagents (Serial RLQYY-58664) | 10/8/2020 | 29 Months | $1,063.98 |
| Allscripts<br>305 Church at North Hills St<br>Raleigh, NC 27609 | EMR Interface | NA | NA | $1,200/year |
| Amazing Charts<br>1600 Division Rd, Suite 2000<br>West Warwick, RI 02893 | EMR Interface | NA | NA | $772.56/year |
| Arkstone Medical Solutions, LLC<br>7000 W Palmetto Park Road<br>Boca Raton, FL 33433 | Molecular Reports | NA | NA | $2,500 monthly minimum<br>Price Per Report<br>500 or fewer = $25 per report<br>1000 or fewer = $22.50 per report<br>1500 or fewer = $20 per report |
| Atlassian, Inc.<br>350 Bush St. Floor 13<br>San Francisco, CA 94104 | Information Technology Software | NA | NA | Estimated $600/month |
| Bio-Rad<br>2000 Alfred Nobel Drive<br>Hercules, CA 94547 | Bio-rad Unity Software and Unity Connect | | | $2480.00 (Yearly subscription) |
| Comcast Business Agreement<br>5728 Schaefer Rd. Ste 203 Dearborn MI 48126 | Internet for Dearborn Drawstation | 36 months | 25 months | 120.00/mo for mo. 1-24;<br>150.00/mo for months 25-36. |
| Comcast Business Agreement  6620<br>HIghland Rd. STE 200 Waterford MI 48327 | Internet for Lab Building | 36 months | 30 Months | 210.00/mo for mo. 1-24; Then 264.95/after per mo. |
| Data Innovations, LLC<br>PO Box 101978<br>Atlanta, GA 30392-1978 | EP Evaluator Software - for COLA requirements (License SUB-0017828) | 9/15/2022 | 5 Months | $1590.00 (Yearly subscription) |
| Ellkay, LLC<br>200 Riverfront Blvd., 3rd Floor<br>Elmwood Park, NJ 07407 | EMR Interface | NA | NA | $1,440/year |
| eMDs, Inc.<br>10901 Stonelake Blvd #200<br>Austin, TX 10901 | EMR Interface | NA | NA | $1,397.35/year |
| LabSoft Inc.<br>2202 Westshore Blvd. Ste 115<br>Tampa, FL 33607 | EMR Interface | NA | NA | $950 per year per customer, which is paid up front OR $95/month |
| Lifepoint Informatics<br>65 Harristown Rd.<br>Glen Rock, NJ 07452 | EMR Interface Middleware | NA | NA | $125/month per client interface<br>$200/month LP Results<br>$250/month LP Orders<br>$300/month LP hosting fee<br>$200/month implementation fee<br>$350/month ref lab fee |
| Medent Lab Clearinghouse Interface<br>15 Hulbert St. P.O. Box 980<br>Auburn, NY 13021 | EMR Interface | NA | NA | $50/month |

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining (in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| Microsoft Corporation<br>One Microsoft Way<br>Redmond, WA 98052 | Office Software/Interfaces | NA | NA | Azure = $1,405.72/month<br>Azure Backup = $175.06/month<br>Business Premium =<br>$1,396.70/every 3 months<br>Power BI = $76.70/month<br>Visio = $57.24/month<br>365 F1 = $271.55/month<br>Apps for Business =<br>$230.19/every 3 months<br>Exchange = $4/month |
| Netalytics, LLC<br>52 Bobo St.<br>Greer, SC 29650 | EMR Interface | NA | NA | $100/clinic/month OR<br>$750/month unlimited clinics |
| Orchard Software Corporation<br>701 Congressional Blvd. Ste 360 Carmel, IN 46032 | Laboratory Information System | 3/13/2020 | 29 Months | $12,000.00 |
| Orchard Software Corporation<br>701 Congressional Blvd. Ste 360 Carmel, IN 46032 | Purple Squirrel | | | |
| Orchard Software Corporation<br>701 Congressional Blvd. Ste 360 Carmel, IN 46032 | Service Level Agreement (SLA)/<br>System Administration | 7/28/2021 | 40 Months | $13,500.00 |
| Translational Software Incorporated<br>7683 SE 27th Street #352<br>Mercer Island, WA 98040 | Pgx Reports | NA | NA | $2,200/month portal subscription<br>Price per report<br>1-100 = $25 per report<br>101-250 = $23 per report<br>251-500 = $20 per report<br>501-1000 = $15.00 per report |
| Triarq Health<br>424 E 4th Street<br>Royal Oak, MI 48067 | EMR Interface | NA | NA | $948/year |

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining ( in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| Dr. Fredric Neumann Sr. 39880 VanDyke Rd  Sterling Heights, MI 48313 | Collection Lease | 1 year initial; Evergreen | 10 | 871.80 |
| Easter Seals listed but has not been paid since Sept. 2022 | | | | |
| Little Sonia Real Estate LLC 9171 Lapeer Road, Suite 100, Davison MI 48423 | Collection Lease | 3 years; Evergreen | 30 | 1698.75 |
| Medical Real Estate Group LLC 29580 Northwestern Hwy Suite 1000 Southfield MI 48034 | Space Lease; Lab Building | Laboratory | 19 months | 16,542.46 |
| Newbsknob, LLC 6310 Sashabaw Rd. Clarkston, MI 48346 | Collection lease | 3 years initial; Evergreen | Initial term: 0.  In 4th year now | 2875.00 |
| Younis Enterprises 5728 Schaefer Rd. Dearborn MI 48126 | Collection Lease | 3 years, Evergreen | 25 | 5001.95 |

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining ( in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1217 | SciEx UT1 Service (BJ27141507) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1218 | SciEx UT2 Service (BB214211608) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1219 | SciEx UT3 Service (AU20440906?) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1220 | SciEx UT4 Service (AU10870902) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1221 | SciEx UT5 Service (AU215091405) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1222 | SciEx UT6 Service (BI25161411) | 10/1/2022 | 5 Months | $3,129.11 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1223 | SciEx UT7 Service (BB24521208) | 10/1/2022 | 5 Months | $2,083.80 |
| AB SCIEX LLC 1201 Radio Rd REDWOOD CITY, CA 94065-1224 | SciEx UT8 Service ( | | | |
| Abbott Clinical Lab Solutions 5990 142nd Ave. N Clearwater, FL 33760 | Immunalysis Reagents on AU680 | 8/31/2022 | 4 Months | Committed Tests Per Month: 130,000 |
| Abbott Laboratories INC., D-942, CP1-4 100 Abbott Park Road Abbott Park, Illinois 60064-6095 | Alinity c Service (AC03064) | 3/24/2023 | 23 Months | $1,213 |
| Abbott Laboratories INC., D-942, CP1-4 100 Abbott Park Road Abbott Park, Illinois 60064-6095 | Alinity i Service (2 instruments, AI21541 and AI03890) | 3/24/2023 | 23 Months | $2,426 |
| Abbott Laboratories INC., D-942, CP1-4 100 Abbott Park Road Abbott Park, Illinois 60064-6095 | Architect c8000 Service (C804864) | 3/24/2023 | 23 Months | $1,125 |
| Abbott Laboratories INC., D-942, CP1-4 100 Abbott Park Road Abbott Park, Illinois 60064-6095 | Abbott Master Agreement (Reagents and Consumables) | 3/24/2023 | 23 Months | Annual Product Commitment: $441,632 Consumable Utilization Estimate: $154,851 |
| Abbott Laboratories, Inc., 1300 East Touhy Avenue, Des Plaines, IL. 60018 | Alinity m Master Agreement | 3/15/2023 | 4 years | Annual Purchase Commitment: 1,291,679.69, Service: 3441.67 / month |
| Agena Bioscience, 4755 Eastgate Mall, San Diego, CA 92121 | Service Agreement: PR20031657 | 3/17/2023 | 12 months | 3036.67 (we have not formally renewed) |
| Beckman Coulter INC. Mail Stop A2-SW-12 250 South Kraemer Blvd P.O. Box 8000 Brea, CA 92822-8000 | Beckman Coulter AU680 Service (2014103536, 7982698) | 9/1/2022 | 4 Months | $1,638.88 |
| Evoqua Water Technologies 1451 East 9 Mile Road Hazel Park, MI 48030 | Service for Medica 120 Unit, Media 60 Unit and Flex 90 Unit | 7/31/2022 | 3 Months | $1,508.83 |
| Leasing Associates of Barrington, Inc. 220 North River Street, East Dundee, IL. 60118 | Sysmex UN-3000 Lease | 3/24/2021 | 60 Months | 2270 |
| Life Technologies Corporation, 5781 Van Allen Way Carlsbad, CA 92008 | Quantstudio 5 Service Agreement | 11/25/2022 | 12 months | 1108.34 |
| Med Water Systems, 2262 South 1200 West Suite 101, Woods Cross, UT. 84087 | MW90 (HP) Lease | 7/1/2022 | 12 months (auto renew) | 355 |

| | | | | |
|---|---|---|---|---|
| Microgenics Corporation<br>46500 Kato Road, Fremont, CA 94538 | Thermo/Microgenics Reagents | 3/1/2023 | 23 Months | Monthly Est. Reagent Purchase Commitment: $3,665 |
| Siemens Healthcare Diagnostics, Inc.<br>2089 Gregson Drive, Cary, NC. 27511 | Sysmex CA-620 and CA-660 Service Agreement | 6/3/2022 | 7 Years | 1190.03 |
| Sysmex America, Inc., 577 Aptakisic<br>Road, Lincolnshire, IL. 60069 | Sysmex XN-550 Service Agreement | 5/11/2022 | 12 Months | 580.13 |
| Sysmex America, Inc., 577 Aptakisic<br>Road, Lincolnshire, IL. 60069 | Sysmex UN-3000 Service Agreement | 6/25/2022 | 12 Months | 1835.53 |

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining (in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| Amro Almradi MDPC PLLC 612 Deauville Ln. Bloomfield Hills, MI 48304 | Laboratory Medical Director | | | $ 3,000.00 |
| Avairis | IT Interface Consultant | 1 year, Evergreen | Complete, month to month now | Unknown, based on hours worked |
| The Sports Marketing Agency | Laboratory Marketing Agreement | 1 year, Evergreen | 12 months | |

| Lessor Name and Address | Purpose (Reason for contract) | Initial Term of Agreement | Term remaining (in months) | Monthly Contracted Amount |
|---|---|---|---|---|
| Cintas | Lab Coats and Rugs | | | |
| Cintas Fire Protection Services | Fire Protection | 1 year; Evergreen | 2 months. Year to Year | Annually ~1200.00 |
| Clarity X | Referral Lab Agreement | Ongoing | Month to Month | Depends on test volume and type |
| CoreBioLabs | Referral Lab Agreement | | | |
| Great Lakes Express Delivery LLC | Courier Transport services | 1 year; Evergreen | 1 month, then month to month | |
| iCare | Remote Temperature monitoring systems | Unknown | Unknown | |
| iOpen<br>1101 Pennsylvania Avenue, NW<br>Washington DC 20004 | Marketing Services Agreement | 2years; Evergreen | 20 months | Unknown |
| Iron Mountain<br>1101 Enterprise Dr. Royersford, PA 19468 | Document Storage | 1 year; Evergreen | Month to Month | Varies based on storage |
| Lab Path Consulting | Compliance Consulting | 1 year; Evergreen | Month to Month | 3,000 |
| LabCorp<br>531 South Spring Street Burlington, North Carolina 27215 | Reference Laboratory | 1 year; Evergreen | Month to Month | Depends on test vol. and type sent |
| McLaren Medical Laboratory<br>4000 S. Saginaw St. Flint MI 48507 | Reference Laboratory Agreement | 1 year and then 2 additional years | 28 months | Depends on test volume and type |
| MedCare MSO<br>150 Washington Avenue Suite #201<br>Santa Fe New Mexico 87501 | Laboratory Billing | 1 year; Evergreen | 4 months | Varies based on claims billed and age of claims |
| MedSpeed LLC<br>140 Industrial Drive, Elmhusrt, Ill 60126 | Courier Transport services | 3 years | 25 months | Various |
| Solaris<br>110 Dewey Dr. Suite A, Nicholasville, Kentucky 40356 | Reference Laboratory | 1 year; Evergreen | Month to Month | Depends on test vol. sent |
| Stericycle | Liquid Waste Removal | Unknown | Unknown | Should be a set price |
| Superior Medical Waste Disposal LLC<br>P.O. BOx 700797 Plymouth, MI 48170 | Biohazard Waste Removal | 3 years; Evergreen | 6 months | Varies based on service levels and locations |
| UPS | Transportation Agreement | NO term | Month to Month | Varies based on shipments |
| | | | | |

In the Matter of:

ARK LABORATORY, LLC,                    Case No. 23-43403-mlo
                                        Chapter 11
          Debtor.                       Hon, Maria L. Oxholm

_____/

## ORDER (1) APPROVING BIDDING PROCEDURES AND OTHER MATTERS RELATING TO THE SALE OF THE DEBTORS' ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ; (2) FORM OF ASSET PURCHASE AGREEMENT; AND (3) SCHEDULING A SALE HEARING; AND GRANTING RELATED RELIEF

Upon preliminary consideration of the motion (the "Sale Motion") of Ark Laboratory, LLC, debtor-in-possession in this chapter 11 case (the "Debtor"), for the entry of an order authorizing and approving (i) bidding procedures, attached to the Sale Motion as **Exhibit C**, form of asset purchase agreement, and certain other matters relating to the Debtor's intended sale of substantially all of its assets (the "Property") as more fully defined in the Asset Purchase Agreement dated June 2, 2023 (the "Agreement") between the Debtor and Auxo Investment Partners, LLC ("Auxo"), which is attached to the Sale Motion as **Exhibit A**; (ii) the sale (the "Sale") of the Property free and clear of liens, claims, interests and encumbrances; and (iii) the assumption and assignment of executory contracts and unexpired leases; this Court having determined that granting the preliminary relief requested

in the Sale Motion, as it pertains to the preliminary relief approved in this Order, is in the best interests of the Debtors, the estate and the Debtors' creditors; that proper and adequate notice of the Sale Motion has been given and that the Court has jurisdiction over this matter pursuant to 27 U.S.C. §§1334 and 157; a hearing having been held, the Court having reviewed the Motion and the Court having found that (i) the Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(6); (iv) notice of the Motion was sufficient under the circumstances; and after due deliberation the Court having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate and its creditors; and good and sufficient cause having been shown;

AND THE COURT FURTHER FINDING AND DETERMINING THAT:

A.   The Debtor's proposed notice of the Bidding Procedures, the Notice of Assumption and Assignment, the Auction and the hearing to approve any sale of the Debtor's Property (the "Sale Hearing") is appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

4878-2110-1674.v2

B.       The Bidding Procedures substantially in the form attached to the Sale Motion as **<u>Exhibit C</u>** are fair, reasonable, and appropriate and are designed to maximize the recovery from the Sale of the Debtor's Property.

C.       The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

D.       To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED in all respects.

2.       The Bidding Procedures attached to the Motion as **<u>Exhibit C</u>** are APPROVED.

3.       The Bid Deadline shall be **July 28, 2023**, at 4:00 p.m. (prevailing Eastern Time).

4.       The Debtor, in conjunction with the Creditors' Committee, shall have the exclusive right to determine whether a bid is a Qualified Bid and shall notify bidders whether their bids have been recognized as such prior to the Auction.[1]

---

[1] All rights granted in favor of the Debtor in these Bidding Procedures shall be exercised in accordance with its fiduciary obligations.

5.     The Auction, if necessary, shall be held on **July 31, 2023**, beginning at 10:00 a.m. (prevailing Eastern Time), at the offices of Miller Johnson, 500 Woodward Avenue, Suite 2800, Detroit MI 48226, or such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids, or at such other later date, time and place as may be designated in writing by the Debtor, in consultation with the Creditors' Committee, and served on Qualified Bidders via electronic mail, facsimile transmission, or overnight mail delivery.

6.     The Sale Approval Hearing shall be held on **August 3, 2023** at 11:00 a.m**.** (prevailing Eastern Time) before this Court, the U.S. Bankruptcy Court for the Eastern District of Michigan, in the courtroom of the Honorable Maria L Oxholm, 18th Floor, 211 W. Fort Street, Detroit, Michigan 48226. or as soon thereafter as counsel may be heard.  Anyone having an objection to the Sale or to the entry of an order approving the Successful Bid must be present if the hearing is an in-person hearing.  The deadline for any party to file an objection to the Sale or assumption of contracts is **July 27, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

7.     The Sale Approval Hearing may be adjourned from time-to-time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Approval Hearing, and the Debtor, in consultation with the Creditors' Committee,

shall have the exclusive right, in the exercise of its fiduciary obligations and business judgment, to cancel the Sale at any time.

8.     The Buyer (as defined in the Agreement) is approved as the "stalking horse" bidder for the purchase of the Property, including the assumption and assignment of certain executory contracts and unexpired leases described in the Agreement. The Buyer's bid for the Assets set forth in the Agreement, plus the minimum overbid increment of $200,000 shall be the floor bid against which any and all other bids shall be considered by the Debtor.

9.     The following forms of notice are approved: (a) Notice of Sale Procedures, Auction Date, and Sale Approval Hearing, in the form substantially similar to that attached to the Motion as **Exhibit D** (the "Procedures Notice") and (b) Notice of Intent to Assume and Assign Executory Contracts and Unexpired Leases (the "Assumption and Assignment Notice"), in the form substantially similar to that attached to the Motion as **Exhibit E**.

10.     The Debtors will serve a copy of the Procedures Notice, together with this Bidding Procedures Order, on the following parties: (a) the U.S. Trustee, (b) counsel for Creditors' Committee, (c) any parties requesting notices in this Case, (d) all creditors or their counsel known to the Debtor to have asserted a lien (including a security interest), claim, right, interest or encumbrance of record against all or any portion of the Assets, (e) all parties who have expressed an

interest in purchasing the Assets (the "Potential Bidders"), and (f) the Matrix (collectively, the "Notice Parties"). Receipt of such Notice of Sale shall constitute notice of the Auction and the Sale Hearing for all purposes.

11.     The Debtor shall serve, or cause to be served, the Procedures Notice within one (1) business day following entry of this Order, by first-class U.S. mail, overnight mail delivery, electronic mail, facsimile transmission, or the Court's ECF notice system.

12.     The Debtor will serve the Motion and the Assumption and Assignment Notice upon each counterparty to executory contracts, leases and the Limited Franchise Agreement, and their counsel (if known). The Assumption and Assignment Notice will state the date, time and place of the Sale Approval Hearing as well as the date by which any objection to the proposed assumption and assignment must be filed and served.

13.     If any counterparty objects for any reason to the assumption and assignment an executory contract or unexpired lease proposed to be assumed and assigned, the counterparty must file the objection by no later than (i) **4:00 p.m. (prevailing Eastern Time) on July 27, 2023** or (ii) such date and time agreed upon between the Debtor and such counterparty.

14.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order. This Order shall be

effective immediately upon its entry, and the 10-day stay provided by F.R.Bankr.P.

6004(g) and 6006(d) is waived.

4878-2110-1674.v2

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

In the Matter of:

ARK LABORATORY, LLC,                    Case No. 23-43403-mlo
                                         Chapter 11
          Debtor.                    Hon, Maria L. Oxholm

_____/

## Bid Procedures

Set forth below are the bid procedures (the "<u>Bid Procedures</u>" or "<u>Bidding Process</u>") to be used with respect to the prospective sale (the "<u>Sale</u>") of substantially all of the assets (the "<u>Property</u>") owned by Ark Laboratory, LLC (the "<u>Debtor</u>"). The Debtor will seek entry of an order from the Bankruptcy Court authorizing and approving the Sale of the Property to the Qualified Bidder (as hereinafter defined) that the Debtor determines to have made the highest or otherwise best offer to purchase the Property (the "<u>Successful Bidder</u>") in the exercise of their business judgment, and after consultation with its legal and financial advisors, and the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>").

## Assets to be Sold

The Debtor is offering for sale the Property as more fully described in the Asset Purchase Agreement dated June 22, 2023 (the "<u>Agreement</u>") with Auxo Investment Partners, LLC (the "<u>Stalking Horse</u>").

## Excluded Assets

The proposed sale includes only the Property as described in the Agreement. All other assets of the Debtor (collectively, the "<u>Excluded Assets</u>"), will remain part of the bankruptcy estate and in all likelihood be liquidated in accordance with the Bankruptcy Code and Rules, any approved Plan of Reorganization or Liquidation, further motion to sell those Excluded Assets, and the further orders of the Court.

1

## Participation Requirements

To participate in the Bidding Process, each person (a "<u>Potential Bidder</u>") must deliver to the Debtor no later than July 28, 2023 at 4:00 p.m. (prevailing time), an executed Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtors, which such Confidentiality and Non-Disclosure Agreement shall be substantially the same as the Confidentiality Agreement (as defined in the Agreement) in all material respects (collectively, the "<u>NDA</u>"). At the same time that the Potential Bidder executes the NDA, the Debtor shall allow the Potential Bidder to conduct due diligence with respect to the Property sought to be acquired as hereinafter provided.

## Due Diligence

The Debtor shall immediately afford each Potential Bidder due diligence access to the Property, including, but not limited to, access to any data room set up for Potential Bidders. The Debtor will designate a representative to coordinate all reasonable requests for additional due diligence from such bidders. Potential Bidders will have the opportunity to review such due diligence at a location designated by the Debtor. Neither the Debtor nor any of its representatives are obligated to furnish any information relating to the Property to any person except to a Potential Bidder under this Bidding Process. Bidders are advised to exercise their own discretion before relying on any information regarding the Property provided by anyone other than the Debtor or its representatives.

## Bid Deadline

A Potential Bidder that desires to make a bid shall deliver a written copy of its bid to Debtor and Debtor's counsel, not later than July 28, 2023, at 4:00 p.m. Eastern Time (the "<u>Bid Deadline</u>") via email at bbassel@gmail.com (other than the Deposit referenced below), and contemporaneously distribute copies of the bids via email to (i) the United States Trustee, Ronna.G.Jackson@usdoj.gov; (ii) counsel to the Creditors' Committee, jgmiller@taftlaw.com and rkruger@taftlaw.com; and (iii) counsel for the Stalking Horse, wolfordr@millerjohnson.com. The Stalking Horse, having already submitted a bid in the form of its entry into the Agreement, shall not be required to submit a bid, but may submit an additional bid in response to the bid of any other Potential Bidder on or before the Bid Deadline. To the extent the Stalking Horse submits an additional bid in response to the bid of any other Potential Bidder, the Debtor shall share the terms of such additional bid of

2

the Stalking Horse with other Potential Bidders and the Creditors' Committee-. The Debtor, in consultation with the Creditors' Committee, may extend the Bid Deadline once or successively, but is not obligated to do so.

## **Bid Requirements**

All bids must include the following documents (the "<u>Required Bid Documents</u>"):

● A letter stating that the bidder's offer is irrevocable until 30 days after the Sale Hearing, currently scheduled for August 3, 2023, and that the Bidder agrees to be bound by such offer if its bid is the Back Up Bid, as defined herein, until such 30- day period has passed;

● An executed copy of an asset purchase agreement in a form substantially the same as the Agreement. Any changes to the Agreement or to the proposed structure of the transaction must be (a) made to and marked on such form of agreement or otherwise provided in writing as part of the Required Bid Documents and (b) agreed to by the Debtor. The asset purchase agreement must set forth a cash bid at least $200,000 in excess of the Purchase Price, as defined in the Agreement, cannot contain any consideration other than cash and assumption of liabilities of the Debtor, and shall not be subject to any financing or other conditions not set forth in the Agreement.

● A good faith deposit (the "<u>Deposit</u>") in the form of a cashier's check or wire transfer (or other form acceptable to the Debtor in its sole discretion) payable to the order of the Debtor's Bankruptcy Estate, % its financial advisor, O'Keefe & Associates, (or such other party as the Debtors may designate) in the amount of $200,000.

● Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Debtor, after consultation with the Creditors' Committee.

● Written acknowledgment that the bid is not subject to due diligence review, board approval, obtaining financing, or the receipt of any non-governmental consents.

Notwithstanding anything to the contrary herein, a Potential Bidder may submit a proposal for an alternative transaction that includes economic terms that would enable the Debtor, in consultation with the Creditors' Committee, to make a meaningful comparison of such bid with other Qualified Bids.

3

After reviewing all of the materials required above, the Debtor, in consultation with the Creditors' Committee, shall determine, and shall notify the Potential Bidder whether it is a Qualified Bidder. The Debtor shall notify a Potential Bidder if it is a Qualified Bidder by 11:59 p.m., July 28, 2023.

A Potential Bidder that timely delivers the Required Bid Documents, whose financial information demonstrates the financial capability of the Potential Bidder to consummate the Sale, has submitted a bona fide offer, and that the Debtor, after consultation with the Creditors' Committee, determines (based on availability of financing, experience and other considerations) to be able to consummate the Sale if selected as the Successful Bidder is deemed to be a "Qualified Bidder." The Stalking Horse shall automatically be considered as a Qualified Bidder by reason of its willingness to act as a stalking horse bidder in connection with the Bidding Process. If the Debtor wishes to disqualify any Potential Bidder who otherwise timely submits an NDA and the Required Bid Documents, the Debtors shall first consult with the Creditors' Committee.

The Debtor will consider a bid only if the bid is on terms acceptable to the Debtor, and the Creditors' Committee, and not conditioned on other conditions unacceptable to the Debtors, in consultation with the Creditors' Committee. A bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "Qualified Bid."

## The Auction and Sale Hearing

After all Qualified Bids have been received, the Debtor intends to conduct an auction (the "Auction") with respect to the Property if a Qualified Bid other than that of Stalking Horse has been received. The Auction shall take place at the July 31, 2023, at 10:00 a.m. at the offices of Miller Johnson, 500 Woodward Avenue, Suite 2800, Detroit, MI 48226, or, in consultation with the Creditors' Committee, such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids. The Auction shall be conducted in the presence of a certified court reporter, who shall transcribe the proceedings for purposes of creating and preserving a record of the Auction. Only the Stalking Horse and any other Qualified Bidders who have submitted the Required Bid Documents in form and substance satisfactory to the Debtor by the Bid Deadline will be eligible to participate in the Auction as bidders and all Qualified Bidders must have an authorized representative present at the Auction. However, the Creditors' Committee, and the Office of the United States Trustee, or counsel for any of the aforementioned parties are authorized to attend the Auction and participate in the process, if desired.

4

Based upon the terms of the Qualified Bids received, the level of interest expressed as to the Property, and such other information as the Debtor, in consultation with the Creditors' Committee, determines is relevant, the Debtor, in consultation with the Creditors' Committee, will conduct the Auction in the manner they determine will result in the highest or otherwise best offer for the Property. If there is not a timely Qualified Bidder other than the Stalking Horse, no auction shall be conducted and the Stalking Horse shall be deemed the Successful Bidder.

All bids at the Auction must satisfy the requirements for a Qualified Bid.

Upon the Auction's conclusion, the Debtor, in consultation with its advisors and representatives of the Creditors' Committee, shall (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest and otherwise best offer (the "Successful Bid"). At the Sale Hearing, the Debtor shall present the Successful Bid to the Court for approval.

## Post Sale Hearing Procedures

Unsuccessful bidders shall be entitled to return of their earnest money deposit within 30 days of the Sale Hearing. If the Successful Bidder fails to consummate the transaction by the Closing Date, as defined in the Agreement, the Debtors shall (i) retain such bidder's earnest money deposit; and (ii) be free to consummate the proposed sale of the Property with the next highest and best bidder (the "Back Up Bidder") at the final price bid by the Back Up Bidder at the Auction (the "Back Up Bid") (or, if that competing bidder is unable to consummate the purchase of the Property at that price, then the Debtor shall retain the Back Up Bidder's earnest money deposit and them may consummate the transaction with the next highest and best competing bidder, and so forth) without the need for an additional hearing or order of the Court. The Debtor shall, upon conclusion of the Auction and in consultation the Creditors' Committee, rank the Qualified Bids in order of its determination of the highest and best Qualified Bids. The Successful Bid shall be ranked first, the Back Up Bid shall be ranked second, and any other Qualified Bids shall be ranked in order of preference by the Debtor, after consultation with the Creditors' Committee, as the next highest and best Qualified Bids. Additionally, Qualified Bidders, including, but not limited to, the Stalking Horse Bidder, shall be required to keep their offer open until 30 days after the Sale Hearing in the event they are the Back-Up Bidder.

# Summary Timeline of Critical Events

| Event | Date | Action Required/Requested |
|---|---|---|
| Sale Procedures | June 29, 2023 | Court enters Sale Procedures Order |
| Sale Notice and Assumption Notice Service Deadline | June 30, 2023 | Deadline for Debtor to provide notice of sale and assumption of executory contracts. |
| Objection Deadline | July 27, 2023 | Deadline for any party to object to the sale or assumption of contracts. |
| Potential Bid Package Deadline | July 28 2023 at 4:00 p.m. (prevailing time) | Deadline to submit Deposit and materials required to qualify as bidder |
| Auction Date | July 31, 2023 | Auction Sale held at offices of Miller Johnson in Detroit, Michigan |
| Sale Hearing | August 3, 2023 | Court Approves Sale |
| Closing Date | August 4, 2023 | Sale Closes |

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN

In the Matter of:

ARK LABORATORY, LLC,                              Case No. 23-43403-mlo

                                                  Chapter 11

          Debtor.                              Hon, Maria L. Oxholm

_____/

## NOTICE OF PROPOSED SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

**PLEASE TAKE NOTICE**, that on August 3, 2023 at 11:00 a.m., a hearing (the "Sale Hearing") will be held before the Honorable Maria L. Oxholm, Bankruptcy Judge, in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (Detroit), located at 211 W. Fort Street, Courtroom 1875, Detroit, MI 48226 to consider the motion of Ark Laboratory LLC, the debtor and debtor-in-possession (the "Debtor") in the above-referenced proceedings, to sell substantially all of the assets owned by the Debtor (the "Property"), free and clear of all liens, claims, interests and encumbrances, to Auxo Investment Partners, LLC ("Auxo") pursuant to the terms of an Asset Purchase Agreement dated June 22, 2023 (the "Agreement"), or such other Purchaser who is the Successful Bidder for the Property. A copy of the Debtor's motion, including a copy of the Agreement, is on file with the Clerk of the Bankruptcy Court and is available upon request from the attorneys for the Debtors.

          **PLEASE BE ADVISED** that the Debtor is authorized to solicit competitive bids for the Property. Auxo has been granted certain bid protections, so that any competitive bid must be at least the Purchase Price as defined in the Agreement plus $200,000.

          **PLEASE BE FURTHER ADVISED** that in order to review due diligence materials interested parties must execute a Confidentiality and Non-Disclosure Agreement in form and substance reasonably acceptable to the Debtor, after consultation with the Creditors' Committee, which such Confidentiality and Non-Disclosure Agreement shall be substantially the same as the Confidentiality Agreement (as that term is defined in the Agreement) in all material respects (an "NDA"). In addition, the interested party must comply with the Bid Procedures approved by the Court in this matter. A copy of the Bid Procedures will be made available upon request to the Debtor's counsel. To participate as a bidder in the Auction, a party must first be determined to be a

"Qualified Bidder." Only "Qualified Bidders" will be entitled to participate in the Auction. Interested parties must deliver to the Debtor not later than 4:00 p.m. Eastern Time on July 28, 2023 the Required Bid Documents by the Bid Deadline as defined in the Bid Procedures.

**PLEASE BE FURTHER ADVISED** that any objections to the proposed sale of the Purchased Assets shall be filed with the Clerk of the Bankruptcy Court, 211 West Fort Street, Detroit, Michigan 48226 and served upon: (i) the attorney for the Debtor, at the address below (ii) Taft Stettinius & Hollister, LLP, 27777 Franklin Road, Suite 2500, Southfield, Michigan 48034, Attn: Judith Greenstone Miller, jgmiller@taftlaw.com and Richard Kruger, rkruger@taftlaw.com, counsel for the Official Committee of Unsecured Creditors; (iii) Miller Johnson, 45 Ottawa Ave. SW, Suite 1100, Grand Rapids, Michigan 49503, Attn. Robert Wolford, wolfordr@millerjohnson.com, counsel for Auxo, and (iv) the Office of the United States Trustee, 211 West Fort Street, Suite 700, Detroit, Michigan 48226, Attn. Ronna G. Jackson, Ronna.G.Jackson@usdoj.gov, on or before 4:00 p.m. (Eastern Time) on July 27, 2023 and any objector must appear at the Sale Hearing to present the objection, if the Court holds an in-person hearing on this matter.

To obtain further information regarding this matter, please contact the attorney for the Debtor.

Respectfully submitted;

/s/ Robert Bassel
Robert N. Bassel P48420
PO BOX T
CLINTON, MI 49236
248.677/1234
bbassel@gmail.com
Counsel for Debtor

Dated: June 23, 2023

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In the Matter of:

ARK LABORATORY, LLC,

Case No. 23-43403-mlo

Chapter 11

Debtor.

Hon, Maria L. Oxholm

_____/

### NOTICE OF (I) DEBTOR'S REQUEST FOR AUTHORITY TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (II) DEBTOR'S PROPOSED CURE AMOUNTS

**PLEASE TAKE NOTICE**, that on June 23, 2023, Ark Laboratory, LLC ("Debtor"), filed *Debtor's MOTION TO APPROVE (1) BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (2) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105(A) AND 363; (3) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365; AND (4) GRANTING RELATED RELIEF* [ECF No. __] (the "Motion") with the Clerk of the Bankruptcy Court seeking, among other things, entry of an order (the "Sale Order") authorizing and approving: (a) the sale of substantially all of its assets (collectively, the "Assets") free and clear of liens, claims, encumbrances and other interests, with all such liens, claims, encumbrances and other interests attaching with the same validity and priority to the sale proceeds, to one or more purchasers submitting the highest or otherwise best offers therefor (the "Sale"); and (b) procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts")..

**PLEASE BE FURTHER ADVISED** on [Date], the Court entered an order (ECF No.__) (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving the bidding procedures for the Sale of the Assets and procedures for the assumption and assignment of Contracts.

**PLEASE TAKE FURTHER NOTICE** that the Debtor will seek approval of the Sale at a hearing presently scheduled to take place on August 3, 2023 at 11:00 a.m.

(prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the U.S. Bankruptcy Court for the Eastern District of Michigan, in the courtroom of the Honorable Maria L Oxholm, 18th Floor, 211 W. Fort Street, Detroit, Michigan 48226 (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing, the Debtor may seek to assume and assign to one or more Successful Bidder(s) for the Assets (each an "Assignee") some or all of the Contracts and any modifications thereto set forth on **Exhibit A** hereto (collectively, the "Assumed and Assigned Contracts"). In addition, the Debtors' calculation of the cure amounts, if any, necessary for the assumption and assignment of the Assumed and Assigned Contracts (the "Cure Amounts") are set forth on **Exhibit A**

**PLEASE BE FURTHER ADVISED** that any objections to the assumption and assignment of any Contract, including without limitation any objection to the Debtor's proposed Cure Amount or the provision of adequate assurance of future performance under any Contract pursuant to Section 365 of the Bankruptcy Code ("Adequate Assurance") shall be filed with the Clerk of the Bankruptcy Court, 211 West Fort Street, Detroit, Michigan 48226 and served upon: (i) the attorney for the the Debtor, at the address below (ii) Taft Stettinius & Hollister, LLP, 27777 Franklin Road, Suite 2500, Southfield, Michigan 48034, Attn: Judith Greenstone Miller, jgmiller@taftlaw.com and Richard Kruger, rkruger@taftlaw.com, counsel for the Official Committee of Unsecured Creditors; (iii) Miller Johnson, 45 Ottawa Ave. SW, Suite 1100, Grand Rapids, Michigan 49503, Attn. Robert Wolford, wolfordr@millerjohnson.com, counsel for Auxo, and (iv) the Office of the United States Trustee, 211 West Fort Street, Suite 700, Detroit, Michigan 48226, Attn. Ronna G. Jackson, Ronna.G.Jackson@usdoj.gov, on or before 4:00 p.m. (Eastern Time) on July 27, 2023 and any objector must appear at the Sale Hearing to present the objection, if the Court holds an in-person hearing on this matter. The objection must identify the Contract to which the objector is a party, describe with particularity any cure the claimant contends is required under Section 365 of the Bankruptcy Code (the "Cure Claim"), identify the basis of the alleged Cure Claim under the Contract, attach all documents supporting or evidencing the Cure Claim; and if the response contains an objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance.

## CONSEQUENCES OF FAILING TO TIMELY FILE
## AND SERVE AN OBJECTION

ANY COUNTERPARTY TO AN ASSUMED AND ASSIGNED CONTRACT WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSUMED AND ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON EXHIBIT A IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, THE ASSUMPTION AND ASSIGNMENT PROCEDURES AND THIS NOTICE SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AND ASSIGNED CONTRACT AND/OR THE CURE AMOUNT SET FORTH ON **EXHIBIT A**, INCLUDING ASSERTING ADDITIONAL CURE AMOUNTS WITH RESPECT TO THE ASSUMED AND ASSIGNED CONTRACT RELATING TO ANY PERIOD PRIOR TO THE TIME OF ASSUMPTION AND ASSIGNMENT.

To obtain further information regarding this matter, please contact the attorney for the Debtor.

Respectfully submitted;

/s/ Robert Bassel
Robert N. Bassel P48420
PO BOX T
CLINTON, MI 49236
248.677/1234
bbassel@gmail.com
Counsel for Debtor

Dated: June __, 2023

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

In the Matter of:

ARK LABORATORY, LLC,                     Case No. 23-43403-mlo
                                         Chapter 11
        Debtor.                         Hon, Maria L. Oxholm
_____/

## ORDER: (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS PURSUANT TO § 363 OF THE BANKRUPTCY CODE, FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND  ENCUMBRANCES; (II) AUTHORIZING AND APPROVING THE TERMS OF THE DEBTOR'S ASSET PURCHASE AGREEMENT AND RELATED AGREEMENTS AND AUTHORIZING CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED THEREIN INCLUDING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN SPECIFIED EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Ark Laboratory, LLC. (the "Debtor"), having filed on June 23, 2023 its

*MOTION TO APPROVE (1) BIDDING PROCEDURES AND FORM OF ASSET*

*PURCHASE AGREEMENT RELATING TO SALE OF SUBSTANTIALLY ALL OF*

*THE DEBTOR'S ASSETS; AND (2) THE SALE OF SUBSTANTIALLY ALL OF*

*THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND*

*ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105(A) AND 363;*

*ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND*

*EXECUTORY CONTRACT PURSUANT TO 11 U.S.C. § 365; AND RELATED*

*RELIEF* (the "Sale Motion")[1], seeking, pursuant to §§ 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorization to sell substantially all its operating assets and assign certain executory contracts and unexpired leases (the "Transaction" or "Transactions"); and this Court having entered on June __, 2023, its *ORDER (1) APPROVING BIDDING PROCEDURES AND OTHER MATTERS RELATING TO THE SALE OF THE DEBTOR'S ASSETS; (2) FORM OF ASSET PURCHASE AGREEMENT; AND (3) SCHEDULING A SALE HEARING* (the "Bidding Procedures Order") approving, among other things, the Bidding Procedures with respect to, and notice of, the Transaction; and the Auction having been conducted in all material respects in accordance with the Bidding Procedures Order on July 31, 2023; and Debtor, having determined that Purchaser has submitted the highest or otherwise best bid for the Purchased Assets and has been designated as the Successful Bidder pursuant to the Bidding Procedures Order; and a hearing having been held on August 3, 2023 (the "Sale Hearing") to consider approval of the sale of the Purchased Assets to Purchaser (as well as the assumption by Purchaser of the

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Asset Purchase Agreement (the "Agreement") by and between the Debtor and Auxo Investment, LLC, (the "Purchaser"), dated as of June 22, 2023 (a copy of which was attached as Exhibit A to the Sale Motion), the Sale Motion, or the Bidding Procedures Order, as the case may be, in that order of priority, unless the context clearly requires otherwise.

2

Assigned Contracts and Assumed Liabilities) pursuant to the terms and conditions of the Agreement, and adequate and sufficient notice of the Bidding Procedures, the Agreement, and the Transaction having been given to parties in interest in this case; and such parties having been afforded an opportunity to be heard with respect to the Sale Motion and all relief requested therein; and the Court having reviewed and considered: (i) the Sale Motion; (ii) the objections to the Sale Motion; and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing, after due deliberation thereon; and good and sufficient cause appearing therefor, and it appearing that the relief requested in the Sale Motion, insofar as it pertains to this Order, is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and the Court being fully advised in the premises;

**IT HEREBY IS FOUND AND DETERMINED THAT:[2]**

A.      This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (N), and (O).  Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

B.     The statutory bases for the relief sought in the Sale Motion are §§ 105(a), 363, and 365 of the Bankruptcy Code, together with Bankruptcy Rules 2002, 6004, 9007, and 9014.

C.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

D.     As evidenced by the proofs of service on file with this Court, due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, the Sale Hearing, the Transaction, and the Auction, have been provided in accordance with §§ 102(1), 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9014, and in compliance with the Bidding Procedures and the Purchase Agreement, to interested persons and entities, including, but not limited to: (1) the Office of the United States Trustee; (2) Purchaser and its counsel; (3) the Creditors' Committee and its counsel; (4) all entities, known to Debtor that assert any

4

Liens against or other interests in the Purchased Assets (or any portion thereof); (5) all parties known to the Debtor who expressed in writing to Debtor an interest in purchasing all or a portion of the Purchased Assets; (6) all non-Debtor parties to any Purchased Contracts; (7) all relevant taxing and regulatory authorities; and (8) all entities required to receive notice pursuant to Bankruptcy Rule 2002, including, without limitation, those entities that have filed a notice of appearance and request for service of papers in these cases.

E.      Such notice with respect to the Sale Motion and the relief requested therein, the Sale Hearing, the Transaction, and the Auction was (i) reasonably calculated to provide all interested parties with timely and proper notice of the Sale, Sale Hearing and Auction, and (ii) good, sufficient, and appropriate under the circumstances. Accordingly, no other or further notice of the Sale Motion, the Sale Hearing, the Transaction, the Bidding Procedures, the Sale Notice, or the Auction is or shall be required.

F.      As demonstrated by the testimony and other evidence, if any, proffered or adduced at the Sale Hearing, the Debtor has conducted the sale process in compliance, in all material respects, with the Bidding Procedures Order.

G.     No consents or approvals are required for the Debtor to consummate the Transaction other than the consent and approval of this Court and those set forth in the Agreement. Neither the execution of the Agreement nor the consummation of the Transaction in accordance with its terms will constitute a violation of any provision of the Debtor's organizational documents or any other instrument, law, regulation, or ordinance by which the Debtor is bound.

H.     The bidding and related procedures established by the Bidding Procedures Order have been complied with in all material respects by the Debtor and Purchaser.  The Debtor received a Qualifying Bid from Auxo Investment Partners, LLC, an Auction for the Purchased Assets was held in material compliance with the Bid Procedures Order, and Debtor has selected Purchaser as the Successful Bidder.

I.     The Debtor is the legal and equitable owner of the Purchased Assets and, upon entry of this Sale Order, the Debtor shall have full authority to consummate the Transaction contemplated by the Agreement. The Agreement and the Transaction have been duly and validly authorized by all necessary corporate action, as the case may be, of the Debtor.

J.     Approval of the Agreement and consummation of the Transaction is in the best interests of the Debtor, its estate, creditors, and other parties in

6

interest, and the Debtor has demonstrated (i) good, sufficient, and sound business purpose and justification, (ii) compelling circumstances for the Sale pursuant to § 363(b) of the Bankruptcy Code prior to, in contemplation of, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the sale to the Purchaser is necessary and appropriate to maximize the value of the Debtor's estate, and (iii) the sale will provide the means for the Debtor to maximize distributions to creditors. To maximize the value of the Purchased Assets, it is essential that the Transaction occur within the time constraints set forth in the Agreement. Time is of the essence in consummating the Transaction.

K.      The Debtor, with the assistance of its professionals, diligently and in good faith marketed the Purchased Assets to secure the highest and best offer therefor by, among other things, making its books and records and the Purchased Assets available to potential buyers for due diligence and providing potential buyers with access to management. In addition, the Debtor served the Bidding Procedures Order, the Sale Motion, and the Agreement on each of the entities that had previously expressed an interest in some or all of the Purchased Assets and published notice of the sale in the Detroit News and Crain's Detroit.

L.     The procedures set forth in the Bidding Procedures Order, including the Auction, were designed to and achieved a fair and reasonable purchase price constituting the highest and best offer obtainable for the Purchased Assets.

M.     A sale of the Purchased Assets at this time pursuant to § 363(b) of the Bankruptcy Code will preserve the existing value of the Purchased Assets and maximize the Debtor's estate for the benefit of all constituencies.

N.     The Agreement between the Debtor and the Purchaser was negotiated, proposed and entered into by the Debtor and the Purchaser in good faith and from arm's-length bargaining positions and without collusion, fraud, or unfair advantage.

O.     At the Sale Hearing on August 3, 2023, no evidence was presented that either the Debtor or the Purchaser engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, no evidence was presented that the Purchaser acted in a collusive manner with any person and no evidence was presented that the aggregate price paid by the Purchaser for the Purchased Assets was controlled by any agreement among the bidders.

P.     The Successful Bidder is purchasing the Purchased Assets in good faith and is a good faith purchaser for value within the meaning of section

8

363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) the Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (b) the Purchaser complied with the provisions in the Bid Procedures Order; (c) the Purchaser agreed to subject its bid to the competitive bidding procedures set forth in the Bid Procedures Order; (d) the Purchaser in no way induced or caused the chapter 11 filing by the Debtor; (e) the negotiation and execution of the Agreement was at arm's-length and in good faith, and at all times each of the Purchaser and the Debtor were represented by competent counsel of their choosing, (f) the Purchaser has not acted in a collusive manner with any person, and (g) all payments to be made by the Purchaser in connection with the sale have been disclosed. The Purchaser will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Transactions contemplated by the Agreement.

Q.     The consideration to be provided by Purchaser, in this case being a credit bid of the Purchaser's indebtedness owed by the Debtor to it, pursuant to the  Agreement: (i) is valid, due and outstanding by the Debtor to the Purchaser, (ii) is fair and reasonable; (iii) is the highest or otherwise best

9

offer for the Purchased Assets; (iv) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (v) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate.

R.     The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code.

S.     The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity of enterprise between the Purchaser and the Debtor. The Purchaser is not holding itself out to the public as a continuation of the Debtor. The Purchaser is not a successor to the Debtor or its estate and the Transaction does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtor.

T.     Subject to the terms of this Order, the transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and, except as expressly provided in the Purchase Agreement, will vest the Purchaser with all right, title, and interest of the Debtor to the Purchased Assets free and clear of all: (i) Liens; (ii) all debts arising under, relating to, or in connection with any act of the Debtor or claims (as that

term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, "Claims"); (iii) encumbrances and (iv) interests of any kind, including, without limitation, the following: (A) interests that purport to give to any party or entity a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Purchaser's interest in the Purchased Assets, or any similar rights; (B) interests relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date; and (C) interests relating to Liens, claims, and encumbrances on the Purchased Assets or against the Debtor (collectively (ii)-(iv) from time to time herein "Interests"); provided, however, that all such Interests shall attach to the proceeds of the Sale, in order of priority as set forth under applicable law unless modified by this Order.

U.    The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if the sale of the Purchased

Assets to the Purchaser and the assignment of the Purchased Contracts to the Purchaser were not free and clear of all Liens and Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Liens or Interests not expressly assumed by the Purchaser.

V.      Subject to the provisions of this Order, the Debtor may sell the Purchased Assets free and clear of all Liens and other Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in §§ 363(f)(1) through (5) of the Bankruptcy Code has been satisfied. Those (i) holders of Interests and (ii) non-debtor parties to Purchased Contracts who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code. Those (i) holders of Interests and (ii) non-debtor parties to Purchased Contracts who did object fall within one or more of the other subsections of § 363(f) of the Bankruptcy Code and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale attributable to the property against or in which they claim Interests.

W.      Under §363 of the Bankruptcy Code, unless otherwise expressly included in Permitted Encumbrances under the Purchase Agreement, the Purchaser shall not be responsible for any Liens or Interests, including in respect of the following: (1) any labor or employment agreements; (2) all

12

mortgages, deeds of trust and security interests; (3) intercompany loans and receivables between the Debtor and any non-Debtor affiliate, (4) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtor; (5) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtor or any of their respective predecessors; (6) Claims or Interests arising under any Environmental Laws with respect to any assets owned or operated by Debtor or any corporate predecessor at any time prior to the Closing

13

Date; (7) any liabilities of the Debtor other than the Assumed Liabilities; (8) as defined in the Agreement, the "Excluded Liabilities"; (9) any bulk sales or similar law; (10) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (11) any theories of successor liability.

X.     Under 11 U.S.C. § 363(f), the (i) transfer of the Purchased Assets to the Purchaser and (ii) assumption and assignment to the Purchaser of the Assigned Contracts will not deem the Purchaser to be a "successor," or subject the Purchaser to any liability whatsoever with respect to, or on account of, the operation of the Business prior to the Closing Date or by reason of such transfer under any applicable laws, whether based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, any theory of implied assumption of any liabilities other than the Assumed Liabilities, any theory of constructive consolidation or merger of the Purchaser and the Debtor, any theory that Purchaser's acquisition is a mere continuation or reincarnation of the Debtor's business, any theory that the Transaction is fraudulent or lacks good faith, or any other theory of antitrust, vicarious, successor, or transferee liability.

Y.     The Debtor has demonstrated that it is an exercise of its sound business judgment to enter into the Transaction, consummate the Sale, and assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Purchased Contracts is in the best interests of the Debtor, its estate, and its creditors. The Assigned Contracts being assumed and assigned to the Purchaser are an integral part of the assets being purchased by the Purchaser and, accordingly, such assumption and assignment of the Assigned Contracts are reasonable, enhance the value of the Debtor's estate, and do not constitute unfair discrimination.

Z.     The consummation of the Transaction (the "Closing") pursuant to the Agreement and the terms of this Order will be a legal, valid, and effective transfer of the Purchased Assets to Purchaser, and will vest Purchaser with all right, title, and interest in and to the Purchased Assets and the Assigned Contracts, free and clear of all Liens and Interests, other than Permitted Encumbrances (as such term is defined in the Purchase Agreement) in accordance with § 363(f) of the Bankruptcy Code.

AA.   The Agreement is a valid and binding contract between the Debtor and Purchaser, which is and shall be enforceable according to its terms.

BB.    All of the provisions of the Agreement are non-severable and mutually dependent.

CC.    Notice of the Sale Motion has been provided to each non-debtor party to an Assigned Contract, together with a statement from the Debtor with respect to the amount, if any, to be paid by the Purchaser to such non-debtor party to cure any defaults under, and to otherwise comply with the requirements of § 365(b) of the Bankruptcy Code with respect to the Assigned Contract to which such non-debtor is party (the "Cure Amounts"). As to each Assigned Contract, payment of the Cure Amount by the Purchaser as determined in accordance with the procedures provided in the Bidding Procedures Order will be sufficient for the Debtor to comply fully with the requirements of § 365(b) of the Bankruptcy Code.

DD.    Purchaser has provided adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of § 365(f) of the Bankruptcy Code.

NOW, THEREFORE IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    The Sale Motion is **GRANTED** on the basis set forth herein (other than with respect to matters already addressed by the Bidding Procedures Order).

2.      Any objections to the entry of this Sale Order or the relief granted herein and requested in the Sale Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are **DENIED and OVERRULED.**

### Approval Of The Agreement, Transaction And Ancillary Agreements

3.      The Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

4.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code and subject to the terms of this Order, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement, and close fully the Agreement, including the assumption and assignment to the Purchaser of the Assumed Contracts, together with all additional instruments and documents that may be reasonably necessary to implement the Agreement and the Sale. The Purchaser shall not be required to seek or to obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any other Sale related document. The automatic stay imposed by section 362 of the

17

Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

5.     This Order shall be binding in all respects upon the Debtor, its estate, all creditors of, and holders of equity interests in, the Debtor, any holders of Liens or Interests in, against or on all or any portion of the Purchased Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, the Purchased Assets and any trustee, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtor's case, and all parties in interest and those otherwise bound by applicable law. This Order and the Agreement shall inure to the benefit of the Debtor, its estate, creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

6.     Upon the Closing, pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Purchased Assets to the Purchaser and such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and shall vest Purchaser with title to the Purchased Assets and, upon the Debtor's receipt of the Purchase Price, other than Permitted Encumbrances and Assumed Liabilities, shall be free and clear of all Liens or Interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims and Interests in respect of

18

the Purchased Assets, with all such Liens or Interests to attach to the cash proceeds ultimately attributable to the property against or in which such Liens or Interests are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens or Interests now have against the Purchased Assets, subject to any rights, claims and defenses the Debtor or its estate, as applicable, may possess with respect thereto. Upon the Closing, the Purchaser shall take title to and possession of the Purchased Assets subject only to the Permitted Encumbrances and Assumed Liabilities.

7.     Except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser or its assignee at the Closing. Upon Closing or as soon as possible thereafter, subject to the terms of this Order, each of the Debtor's creditors is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Liens or Interests in the Purchased Assets, if any, as such Liens or Interests may have been recorded or may otherwise exist.

8.     The Debtor is hereby authorized to take any and all actions necessary to consummate the Agreement, including any actions that otherwise

19

would require further approval by its members or its board of directors without the need of obtaining such approvals.

9.     Upon Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Purchased Assets or a bill (or bills) of sale transferring good and marketable title in such Purchased Assets to the Purchaser. Upon Closing, this Order also shall be construed as, and constitute for any and all purposes, a complete and general assignment of all right, title, and interest of the Debtor and its bankruptcy estate to the Purchaser in the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

10.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, and the cancellation of any liens and other encumbrances of any kind whatsoever except those assumed as Assumed Liabilities or Permitted Encumbrances.

11.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of

the Purchased Assets (other than statements or documents with respect to Permitted Encumbrances) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Purchaser is hereby authorized, on behalf of the Debtor and each of the Debtor's creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

12.     This Order is and shall be effective as a determination that, upon Closing, all Liens or Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date, other than Permitted Encumbrances and Assumed Liabilities, shall have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by

21

operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement..

## Distribution of Sale Proceeds

13.     Upon Closing, any cash sale proceeds, plus the carve out (the "Carve Out") consisting of (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) calculated at $111,000 based on the valuation of the Debtor's assets in Schedule A/B, and (b) amounts due to the Debtor's Professionals and the Committee's Professionals under the Stipulated Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection (the "Final Cash Collateral Order") [Doc. No. 144], shall be remitted directly to the Debtor, as follows: (i)  the Carve Out will be transferred to and held in the DIP Professionals Account as defined under the Final Cash Collateral Order; and (ii) the balance will be transferred to and held in a segregated DIP account for which Debtor's financial advisor, Russell Long of O'Keefe & Associates, will be made an additional signatory (the "DIP Sale Proceeds Account"). All distributions and withdrawals from the DIP Sale Proceeds Account will require 2 signatures.

## Assumption And Assignment Of Assigned Contracts

14.     The Purchaser shall be responsible for curing all allowed pre-petition monetary and non-monetary defaults relating to the Assigned Contracts. Pursuant to Section 365 of the Bankruptcy Code, the Debtor is authorized to assume the Assigned Contracts designated in the Agreement, cure the same (in the Cure Amounts set forth in the notice relating to such contracts or by further order of the Court) and assign the same to Purchaser.

15.     The Assigned Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser.

16.     All defaults or other obligations of the Debtor under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured, subject to the satisfaction of the provisions of Paragraph 14 (relating to payment by the Purchaser

23

of the applicable Cure Amounts), above, and Purchaser shall have no liability or obligation arising or accruing under the Assigned Contracts prior to the Closing Date, except as otherwise expressly provided in the Agreement.

17. Under §365 of the Bankruptcy Code, provided that the Purchaser pays the applicable Cure Amount, each nondebtor party to an Assigned Contract hereby is forever barred from asserting against Purchaser or the Purchased Assets, any default existing as of the Closing Date or any counterclaim, defense, setoff, or any other claim asserted or assertable against the Debtor as of the Closing Date.

18. The failure of the Debtor or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtor's and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

## Prohibition of Actions Against the Purchaser

19. The Transaction has been, and is undertaken by the Debtor and Purchaser in good faith, as that term is used in § 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is in all respects a good-faith purchaser of the

24

Purchased Assets and is entitled to all of the benefits and protections afforded by § 363(m) of the Bankruptcy Code..

20. Under § 363 of the Bankruptcy Code, except for the Permitted Encumbrances and Assumed Liabilities, or as otherwise expressly provided for in this Order or the Purchase Agreement, the Purchaser shall not have any liability or other obligation of the Debtor arising under or related to any of the Purchased Assets. Without limiting the generality of the foregoing and subject to § 363 of the Bankruptcy Code, the Purchaser shall not be liable for any Claims or Interests against the Debtor or any of its predecessors or affiliates, other than the Assumed Liabilities, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between the Debtor and any non-Debtor affiliate, liabilities relating to or arising from any Environmental Laws, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.

Neither the purchase of the Purchased Assets by the Purchaser nor the fact that the Purchaser is using any of the Purchased Assets previously operated by the Debtor will cause the Purchaser to be deemed a successor in any respect to the Debtor's businesses or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtor's liability under such law, rule, or regulation or doctrine.

22.     Under § 363 of the Bankruptcy Code, except with respect to Permitted Encumbrances and Assumed Liabilities, all persons and entities, including, but not limited to, all debt security holders, equity security holders, unions, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens or Interests of any kind or nature whatsoever against or in all or any portion of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred from asserting against the Purchaser,

26

any of its affiliates, its successors or assigns, their property or the Purchased Assets, such persons' or entities' Liens or Interests in and to the Purchased Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, any of its affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim against the Purchaser, any of its affiliates, its successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or its successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets or (vii) any action seeking to hold the Purchaser liable as a successor under any collective bargaining agreement of the Debtor. On the Closing Date, or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtor's creditors, to execute such

27

documents and take all other actions as may be necessary to release Liens or Interests in or on the Purchased Assets (except Permitted Encumbrances and Assumed Liabilities), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

23.     Except to the extent expressly included in the Assumed Liabilities, or by applicable law or statue, the Purchaser and its affiliates shall have no liability, obligation or responsibility under the WARN Act (29 U.S.C. §§ 210 et seq.), CERCLA or any foreign, federal, state or local labor, employment or Environmental Law by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

24.     Under §363 of the Bankruptcy Code, all persons and entities are hereby forever barred from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

25.     Based on the evidence provided at the Sale Hearing on July __, 2023, the Purchaser has given substantial consideration under the Agreement for the benefit of the Debtor, its estate, and creditors. Under §§363(f), (n), and (m) of the Bankruptcy Code, the consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens

pursuant to this Order, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in, or Claims against the Debtor or any of the Purchased Assets, other than holders of Liens or Claims relating to the Assumed Liabilities. Based on the evidence provided at the Sale Hearing on August 3, 2023, the Purchaser is a good faith purchaser of the Purchased Assets and the consideration provided by the Purchaser for the Purchased Assets under the Agreement is fair and reasonable.

26. For the avoidance of doubt, nothing in this Order shall limit, modify, or in any way affect the Secretary (the "Secretary") of the U.S. Department of Health and Human Services' authority to regulate Debtor's or the Purchaser's enrollment or participation as a Medicare provider (to the extent the Purchaser enrolls or participates as a Medicare provider) or the right and authority of the Secretary, the Centers for Medicare & Medicaid Services ("CMS") or its contractors to review, approve, deny, or pay Medicare claims in the ordinary course of business in accordance with the provisions of, and regulations, policies and procedures promulgated under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk (collectively, the "Medicare Program"). The United States takes no position with respect to, and nothing herein shall be construed as, the Secretary's consent to, or acceptance of, the Asset Purchase Agreement or any underlying transactions described in or supporting the [Asset Purchase Agreement].

27.    For the avoidance of doubt, notwithstanding anything to the contrary in this Order or the Asset Purchase Agreement, (i) Debtor shall not assume and assign or otherwise transfer any national provider identifier, provider transaction access number or Medicare enrollment agreement to the Purchaser; (ii) Debtor shall not loan or otherwise permit the Purchaser to use or submit claims under Debtor's provider transaction access number or Medicare enrollment agreement except in accordance with the Medicare Program and with the approval of CMS; and (iii) nothing shall restrict or limit the United States' rights of setoff and recoupment.

## Additional Provisions

28. This Court retains jurisdiction, subject to the terms of this Order, to:

(a)    Interpret, implement, and enforce the terms and provisions of this Order and the terms of the Agreement, all amendments thereto, and any waivers and consents thereunder, and of each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Purchaser;

(b)    Protect Purchaser or any of the Assigned Contracts or Purchased Assets against any of the Liens or Interests (other than the Permitted Encumbrances), as provided herein, with respect to the

30

commencement or continuation of any action seeking to impose successor or other liability upon the Purchaser;

(c)     Enter orders in aid or furtherance of the Sale and the Transaction;

(d)     Compel delivery of all Purchased Assets to Purchaser;

(e)     Adjudicate any and all remaining issues concerning the Debtor's right and authority to assume and assign the Assigned Contracts and the rights and obligations of Purchaser with respect to such assignment and the existence of any default (including any Cure Amounts) under any such Assigned Contract;

(f)     Adjudicate all issues concerning any actual or alleged Liens or Interests in and to the Purchased Assets, including the extent, validity, enforceability, priority, and nature of all such actual or alleged Liens or Interests; and

(g)     Except as expressly provided for herein, adjudicate any and all issues and/or disputes relating to the Debtor and title or interest in the Purchased Assets and the proceeds of the Sale, the Sale Motion, and/or the Agreement.

29.     The consideration provided by the Purchaser to the Debtor pursuant to the Agreement for the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

30.     There are no brokers involved in consummating the Sale and no brokers' commissions are due.

31.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

32.     The terms and provisions of the Agreement, the ancillary agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor and Purchaser and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of this case to a case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding. The Agreement and the Transaction may be specifically enforced against, and shall not be subject to rejection or avoidance by, the Debtor or any Chapter 7 or Chapter 11 trustee of the Debtor.

33.     The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or

32

supplement does not have a material adverse effect on the Debtor or the Debtor's estate.

34.     The failure specifically to include any particular provisions of the Agreement or the ancillary agreements in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Agreement and the ancillary agreements be authorized and approved in their entirety.

35.     To the extent of any inconsistency between the provisions of this Sale Order, the Agreement, and any documents executed in connection therewith, the provisions contained in this Sale Order and the Agreement and any documents executed or delivered in connection therewith shall govern, in that order.

36.     Nothing contained in any chapter 11 plan confirmed in this chapter 11 case or any order of this Court confirming such plan or any other order entered in this chapter 11 case (or any converted chapter 7 case) shall conflict with or derogate from the provisions of the Agreement, to the extent modified by this Order, or the terms of this Order.

37.     In the event that this chapter 11 case is dismissed or converted to a chapter 7 case, or a trustee is appointed (whether under chapter 11 or 7), neither the dismissal or conversion of this case, nor the appointment of such a trustee, shall affect, in any manner the rights of Purchaser under the Agreement or this Sale

Order, or any other agreements executed by the Debtor in conjunction with the Sale and the Transaction, and all of the rights and remedies of Purchaser under this Sale Order, and such agreements shall remain in full force and effect as if the case had not been dismissed or converted or a trustee had not been appointed.

39.     The provisions of this Sale Order are non-severable and mutually dependent.

40.     To the extent that the Purchaser obtains the business records of the Debtor as part of the Agreement, the Purchaser shall maintain the business records of the Debtor and shall reasonably cooperate with and provide the records upon request to the Debtor, the Creditor's Committee, and any subsequently appointed liquidation agent and/or trustee.

41.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and the Debtor and Purchaser are authorized to close the Sale immediately upon entry of this Order. Notwithstanding the provisions of Bankruptcy Rules 6004 and 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply. Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time

prescribed by law and prior to the Closing Date, or risk its appeal being foreclosed as moot.